# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM VICTOR,** | : | **NO. 3:08-CV-01374** |
| | : | |
| **Plaintiff,** | : | **(Judge Nealon)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **R.M. LAWLER, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

In the case of William Victor we most assuredly do not write upon a blank slate. Indeed, since this action was initiated by Victor against 29 named Defendants in July of 2008, (Doc. 1), there have been more than 325 separate filings in this *pro se* civil rights action. During the past two and one-half years, the process of litigation has incrementally narrowed and focused the scope of this lawsuit. As a result of this process we have defined those claims which raise factual issues which must be tried by a jury, and identified those Defendants as to whom there are undisputed issues of material fact and with respect to whom the Defendants are entitled to judgment as a matter of law.

Through this process, it has been determined that nine Defendants, including, a prison supervisor, a correctional lieutenant, face allegations of grave misconduct involving the alleged beating of the Plaintiff during a June 28, 2008 cell extraction,

and a subsequent effort to cover-up that beating, allegations which should and must be tried by a jury. Therefore, William Victor will undeniably have his day in court in this case.

In this report and recommendation, we now complete this process of pretrial litigation, by making recommendations regarding the disposition of the final pending, and potentially dispositive, motion filed in this matter, a motion for summary judgment filed on behalf of the remaining correctional officials named in Victor's complaint. These are correctional officials who are not alleged to have directly participated in the alleged beating of the Plaintiff on June 28, 2008, and, therefore, come before the court in a substantially different posture than those Defendants who are directly implicated in this alleged misconduct..

As to these remaining Defendants, we find that Victor has not stated a claim upon which relief can be granted. Accordingly, for the reasons set forth below, we recommend that this motion for summary judgment be granted as to these Defendants.

## II.    Statement of Facts and of the Case.

This is a civil rights action brought by William Victor, an inmate who was formerly confined in the State Correctional Institution at Huntingdon ("SCI-Huntingdon"). In his complaint, Victor, who is proceeding *pro se*, initially named 29

Defendants, including the prison superintendent and other employees of the Pennsylvania Department of Corrections at SCI-Huntingdon.

Victor's current complaints are, in some respects, far-reaching and embrace a host of seemingly disparate actors and events. At the heart of this complaint, however, rests a singular, significant incident: Victor alleges that on June 28, 2008, he was assaulted by Corrections Officers while being moved between cells in the Restricted Housing Unit ("RHU") at SCI-Huntingdon. Attachment to Plaintiff's Amended Complaint at ¶ 6. Victor's jaw was broken in this assault, requiring medical treatment outside the prison. Moreover, the record contains evidence that appears to support Victor's claims that a number of correctional staff endeavored to cover-up and  conceal the true facts surrounding this episode.

A. **Victor's June 28, 2008 Cell Extraction and Victor's Allegations Concerning the Culpability of the Cell Extraction Team**

The seminal events that give rise to this lawsuit occurred in the summer of 2008, at SCI-Huntingdon. In June of 2008, the Plaintiff, William Victor was serving a life sentence for murder and had served time under his sentence at various state correctional facilities throughout Pennsylvania.  At all times material to this action, Victor was incarcerated at SCI-Huntingdon and was specifically housed in the G-block restricted housing unit ("RHU") at SCI-Huntingdon.

On June 28, 2008, a team of correctional officers, led by Lieutenant Diffin extracted Victor from his cell in the RHU at SCI-Huntingdon. In the course of this cell extraction, it is undisputed that Victor's jaw was broken while he was removed him from his cell in the Restricted Housing Unit. Along with Lieutenant Diffin, the members of this cell extraction team who were directly involved in this episode included correctional officers Goodman, Lehman, Grove, Plummer, Pyle, Eberling and Snyder.

As to these Defendants, the extensive record of the proceedings in this case creates a host of material, and unresolved, factual issues. At the outset, there are clear, and clearly unresolved, factual questions concerning the roles of the various Defendants in this cell extraction and how their roles may have contributed to the broken jaw which was undeniably suffered by Victor on June 28, 2008. There are also other presently unresolved and material factual questions concerning the activities of the Defendants in connection with this cell extraction. There is evidence in the record that supports Victor's allegations that on the day of Victor's cell extraction some of these Defendants may have also tried to stage the scene of the cell extraction, and create a false account of events leading up to the cell extraction. In particular, there is evidence in the record that supports Victor's allegation that Defendant Diffin may have caused a noose to be planted in Victor's cell, in an apparent effort to falsely

suggest both that there was an exigency to the cell extraction and that Victor may have harmed himself on June 28, 2008.

There is also evidence in the record that would show that a number of participants in the cell extraction were involved in efforts to conceal this conduct. For example, Defendant Snyder has been directly implicated in the staging of this scene on June 28, 2008. Specifically, there is evidence which indicates that Snyder, acting at Diffin's direction, brought a sheet to Victor's cell which was then fabricated into a noose in order to create the false impression that Victor had attempted suicide on June 28, 2008. (Doc. 259.)

Similarly, there is direct evidence linking Defendant Goodman to an effort to conceal the nature of this alleged abuse. On June 28 Goodman was assigned as the videographer for the cell extraction team. As such, he was responsible for ensuring that a complete and accurate videotaped record existed of all of the events surrounding this cell extraction. However, there is evidence showing that Goodman selectively edited the videotaping of this particular cell extraction, failing to videotape particularly incriminating portions of this incident, a failure which the Defendants later claimed was an inadvertent oversight. (Doc. 259.)

In addition, another corrections Defendant, a nurse named Hallie Ritchey was directly implicated in these efforts to falsely claim that there was a noose in Victor's

cell, in an apparent effort to suggest both that there was an exigency to the cell extraction and that Victor may have harmed himself on June 28, 2008. Victor also alleges that, after the incident Ritchey refused to treat him, despite his complaints regarding his broken jaw, and refused to document the nature, extent and scope of his injuries, as she was required to do. (Doc. 1.)

Furthermore, it is apparent that the Commonwealth itself has found that there are substantial, unresolved factual questions relating to the conduct many of these Defendants in connection with this cell extraction since the State has withdrawn from representing these Defendants in this civil lawsuit, stating that: "It has been determined that those Corrections Defendants acted in bad faith and/or outside the scope of their employment and so are not entitled to representation by Commonwealth agency counsel." (Doc. 114, p. 3.)

Thus, as to at least nine Defendants–Corrections Defendants Diffin, Eberling, Goodman, Lehman, Plummer, Snyder, Grove, Pyle, and LPN Ritchey–there are plainly unresolved factual issues regarding their role, if any, in alleged wrongdoing at the time of Victor's June 28, 2008 cell extraction. These unresolved factual issues relate both to the question of whether excessive force was used against Victor at the time of this cell extraction, and the related issue of whether prison staff staged a scene in an effort to conceal physical abuse of Victor.

## B. Victor's Allegations Regarding the Actions of Other Prison Staff on June 28, 2008

Victor's complaint then levels a series of less focused accusations against three other named Defendants arising out of the events of June 28, 2008. Specifically, Victor alleges that, in the immediate aftermath of this beating at the hands of the cell extraction team, he was taken to the prison infirmary, where two nurses– Defendants Moore and Miller–as well as one corrections Defendant–Lieutenant Cooper– saw him, but ignored his broken jaw, and left him untreated and in pain. Victor also contends that the reports prepared by these three Corrections Defendants regarding their encounters with Victor at the infirmary in the immediate aftermath of this incident were falsified to conceal the nature and extent of his injuries. (Doc. 242.) For their part, Defendants Moore, Miller and Cooper deny Victor's claims, while acknowledging that they had contact with Victor, who they described as injured, bleeding, and agitated, at the infirmary on the evening of June 28, 2008. (Doc. 227, ¶¶ 33-54.) While these facts may be disputed, what is undisputed is the fact that Victor never fully exhausted administrative remedies with respect to these Correctional Defendants. (Compare Doc. 227, ¶¶21-31, with, Doc. 242. ¶¶21-31.)

## C.     Victor's Claims Against Other Correctional Staff Relating to Other Alleged Episodes of Misconduct

Against the backdrop of this serious June 28, 2008, incident, Victor has also leveled a series of other allegations against disparate correctional staff for a broad array of alleged misconduct which Victor claims occurred at various other times and locations in the prison. At least four other correctional officers have been identified by Victor and named as Defendants as a result of their alleged involvement in these other, unrelated actions.

Victor summarized these unrelated complaints in the course of his deposition in this lawsuit. Specifically, Victor claimed that in November of 2007, he was assaulted by Defendant Officer Grove. (Doc. 227 ¶7, citing Victor deposition at 81-83.) According to Victor, this assault occurred when he was returning from a visit with his attorney.(Id.) Victor asserts that he was handcuffed and Officer Grove yanked his arms, an incident which did not injure Victor and only resulted in pain "for a few seconds."(Id. at 84.) In addition to this episode, Victor contended that Officer Grove sexually harassed him, by making remarks of a sexual nature directed at the Plaintiff. (Id., at 113-14.) Victor leveled similar allegations against Defendant Officer Garzarelli, asserting that Garzarelli also made sexually harassing remarks toward him at various unidentified times. (Id. at 113-115. ) In a similar vein, Victor

alleged that Defendant Officer Butler used offensive language against him, deprived him of exercise yard access and retaliated against him by searching his cell and disorganizing his property.( Id. at 115-17, 120-122.) Victor then further contended that on May 18, 2008, he was in the shower in the RHU when Defendant Sergeant Clapper put his hand through the bars of the door and choked him "for a few seconds." (Doc. 227 ¶7, citing Victor deposition at 22-24.) When asked if he was injured in this incident, Victor stated that his neck was "just a little irritating from being choked for a few seconds." (Id. at 32-33.) Once again, as to all of these disparate claims, it appears that Victor never fully exhausted administrative remedies with respect to these Correctional Defendants. (Compare Doc. 227, ¶¶21-31, with, Doc. 242. ¶¶21-31.)

### D. Victor's Claims Against Prison Supervisors, Prison Investigators and Prison Adjudicators

Furthermore, in addition to these correctional staff who had direct contact with Victor at SCI-Huntingdon, Victor has named seven supervisory, adjudicative or investigative prison officials as Defendants in this lawsuit.

For example, Victor named the prison superintendent, R.M. Lawler, as a Defendant, alleging that Lawler did not adequately respond to his requests and prior allegations of misconduct at the prison, (id. 122-123), and failed to object to initial

investigative findings made by Security Lieutenant Morrison regarding the June 28, 2008 incident. (Id. at 124-125.) Victor further contended that five other prison supervisors, Captains Harris and Harman as well as Lieutenants Morrison, Baird, and Lalli, should also be held personally liable to him because they either supervised staff who allegedly abused Victor, or failed to adequately investigate Victor's allegations of misconduct. (Id. 126-36.) Thus, as to these Defendants, the apparent premise of Victor's complaint is that the Defendants' supervisory stations make them personally liable for misconduct by staff, and render them personally culpable for the outcome of inquiries into inmate grievances. (Id.)

Victor likewise contends that a prison hearing examiner, Defendant Mitchell, violated his rights by making adverse rulings in the course of adjudicating various disciplinary matters lodge against Victor while he was housed at SCI-Huntingdon.[1] Like many of his other claims, it appears that Victor never fully exhausted administrative remedies with respect to these Correctional Defendants. (Compare Doc. 227, ¶¶21-31, with, Doc. 242. ¶¶21-31.)

_____

[1]Finally, Victor initially also lodged claims against Deputy Superintendents Corbin and Fisher, Lieutenant Stevens, and Correctional Officer Maul, but voluntarily dismissed these claims in May, 2010. (Doc. 267.) Furthermore, Victor filed a claim against Defendant Dr. Long, alleging that the doctor who provided care to Victor following the June 28 incident, was deliberately indifferent to his medical needs. That claim, however, has been dismissed by the Court. (Doc. 326.)

### E.    Victor's Failure to Exhaust Administrative Grievances

With respect to this broader array of Defendants and claims, Victor had an obligation to pursue administrative grievances through the Department of Corrections system before proceeding into federal court. In 2008 there were established grievance procedures available to Victor in the Department of Corrections. The administrative procedure that inmates must use to prosecute grievances is provided for in Department of Corrections Administrative Directive 804. ("DC-ADM 804"). The grievance system is comprised of three tiers. Pursuant to DC-ADM 804, the first step in the inmate grievance process, except for those expressly governed by other procedures, is an initial review. At this stage, an inmate must submit a grievance within 15 working days of the event on which the grievance is based. (Id.) An inmate who is dissatisfied with the initial decision may appeal to the Facility Manager within 10 working days from the date of the initial review decision. (Id.) At a state correctional institution, the Facility Manager is the institution's Superintendent. If an inmate is not satisfied with the result of the Facility Manager's review of his appeal, he may appeal to final review with the Secretary's Office of Inmate Grievances and Appeals by filing an appeal with that office within 15 working days of the date of the Facility Manager's decision. Extensions to these deadlines could be granted at the discretion of the agency if the inmate submitted a written explanation for a failure to

timely file the grievance or an appeal. (DC-ADM 804 (VI)(B)(3), (VI)(C)(2)(a), (VI)(D)(1)(c).)

In this case the Department of Corrections has reviewed its records of all grievance appeals submitted by Victor from November 1, 2007, until November 1, 2008, during the time he was housed at SCI-Huntingdon. This review revealed that Victor appealed a total of six grievances to final review during this time frame. Four of the grievances involved various health care issues and one other appeal related to his inmate account, matters which are not presented in this lawsuit. All of these institutional responses were upheld on appeal. (Doc. 227, Varner Dec. at ¶ 6. See also Exhibits "A," "B," "C," "D," "E," and "F." )

In only one of these grievances did Victor fully exhaust claims on matters which are the subject of this litigation. Victor submitted, and fully exhausted, a grievance which alleged that he was subject to excessive use of force in the RHU on June 28, 2008.That grievance identified Corrections Defendants Diffin, Eberling, Lehman, Plummer, Grove, Pyle, and LPN Ritchey as participants in this conduct, and provided descriptions identifying the roles of Defendants Goodman and Snyder in this episode.  In response to this grievance Victor was told that the matter was being investigated by the Office of Professional Responsibility and that at the conclusion of the investigation, he would be told a summary of the results. It was upheld on

appeal to Superintendent Lawler and the Chief Grievance Officer. (Id. at ¶ 8. *See* Exhibit "B.")

With this one exception, the Department of Corrections has no record of any other appeals to final review from grievances filed by Victor during this time period, which identify in any way any other Defendants named in this lawsuit or address any other issues presented by Victor in this litigation. (Id., at ¶ 13.)

### III.  Discussion

### A.  Summary Judgment-Standard of Review

The Defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## B. Exhaustion of Administrative Remedies

The Defendants first urge the Court to grant summary judgment on many of the the Plaintiff's claims because Victor failed to exhaust the administrative remedies available to him under Department of Corrections procedures. This failure to timely pursue these administrative remedies may have substantive significance for the Plaintiff since the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See also Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007) ("The [PLRA] requires that prisoners seeking relief in federal court must first exhaust the administrative remedies available at the prison level.").

The PLRA's exhaustion requirement applies to a wide-range of inmate complaints, including damages complaints like those made here grounded in alleged violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution. See, e.g., Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v.

Churner, 206 F.3d 289 (3d Cir. 2000). A prisoner is not required to allege that administrative remedies have been exhausted. Ray v. Kertes, 285 F.3d 287, 297 (3d Cir. 2002). Rather, failure to exhaust administrative remedies is an affirmative defense, id., and as such must be pled and proven by the defendants, Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002). Furthermore, although this exhaustion requirement is not a jurisdictional bar to litigation, the requirement is strictly enforced by the federal courts. See Jones v. Bock, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). The rigorous enforcement is mandated by the recognition that § 1997e's exhaustion requirement promotes important public policies. As the United States Court of Appeals for the Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements. They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining part may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process. Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). . . . [A] comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." Moreover, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the

16

infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards. And when the prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages. In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring. An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto. . . . In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained. The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures. All of these functions help courts navigate the sea of prisoner litigation in manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204, F.3d 65, 75-76 (3d Cir. 2000) (citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to the rule. Id. Instead, courts have typically required complete administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court. Moreover, courts have also imposed a procedural default component onto this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding in federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). In this

regard, the PLRA requires "'proper exhaustion,' meaning that the prisoner must comply with all the administrative requirements and not merely wait until there are no administrative remedies 'available.'" Williams, 482 F.3d at 639 (citing Woodford v. Ngo, 548 U.S. 81, 85 (2006)). Applying this procedural default standard to § 1997e's exhaustion requirement, courts have concluded that inmates who fail to fully complete the prison grievance process are barred from subsequently litigating their claims in federal court, Booth v. Churner, 206 F.3d 289 (3d Cir. 2000), and the failure to properly exhaust administrative remedies will result in the procedural default of a prisoner's claim, Spruill, 372 F.3d at 230-32.

Furthermore, applying this procedural default component to the exhaustion requirement, Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004), it has been held that:

> As for the failure to the identify named defendants on the grievance form, . . . to the extent the identity of a defendant was "a fact relevant to the claim," Pennsylvania's prison grievance policy mandated that the identification be included in the inmate's statement of facts on the grievance form. And, . . . in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies under the PLRA.

Williams v. Pennsylvania Dep't. of Corrections, 146 F. App'x 554, 557(3d Cir. 2005). Thus, "it is clear, regardless of the purpose of the requirement, that Spruill requires the prisoner-grievant-plaintiff to name in the grievance those he eventually

sues, upon pain of procedural default." Hemingway v. Ellers, No. 07-1764, 2008 WL 3540526, *11 (M.D.Pa. Aug.12, 2008).

This broad rule admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d. Cir. 2000). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis v. Warman, supra, 49 F. App'x at 368. See also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir.2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and uncontradicted correctional officers impeded filing of grievance).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. Harris v. Armstrong, 149 F.App'x 58, 59 (3d Cir. 2005). Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. Davis v. Warman, 49 F.App'x 365, 368 (3d Cir. 2002). Thus, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. Oliver v. Moore, 145 F. App'x 731 (3d Cir. 2005)(failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

In this case, it is evident that Victor alleged in one fully-exhausted grievance that he was subject to excessive use of force in the RHU on June 28, 2008.That grievance, however, only appears to identify Corrections Defendants Diffin, Eberling,

Goodman, Lehman, Plummer, Snyder, Grove, Pyle, and LPN Ritchey as participants in this conduct. Given this undisputed grievance history, the remaining Defendants have asserted Victor's failure to fully exhaust these administrative remedies with respect to them  as an affirmative, and dispositive, defense to most of the claims brought here. Victor has offered only an extremely limited response in opposition to Defendants' assertions regarding exhaustion consisting of little more than a denial of some of the Defendants' detailed assertions, coupled with speculative claims that some grievances were destroyed or lost. We find that these conclusory denials are insufficient to overcome the completely well-documented assertions regarding the Plaintiff's failure to exhaust that Defendants supported with a detailed, sworn declaration from Dorina Varner.

Although this dispute arises before the Court on a motion for summary judgment, we find that it is appropriate for the Court to resolve this fundamental issue at this point, and that it is proper to do so. Indeed, we note that judicial resolution of such preliminary factual matters relating to exhaustion of inmate claims has been expressly authorized by the courts. See Bryant v. Rich, 530 F.3d 1368, 1373-74 (11th Cir. 2008), cert. denied, 129 S. Ct. 733, 172 L. Ed. 2d 734 (2008); McClain v. Alveriaz, No. 07-5551, 2009 U.S. Dist. LEXIS 100655, * 8-9 n.1 (E.D. Pa. Oct. 26,

2009) ("Notably, a district court may act as a factfinder in resolving a factual dispute with respect to a failure to exhaust defense.").

Moreover, the standards which govern determination of summary judgment motions also compel us to reach this question as a matter of law. Resolving this issue on summary judgment is entirely appropriate here, where the Plaintiff's response to the Defendants' thoroughly documented exhaustion argument consists of nothing more than cursory denials of these factual averments coupled with speculative and conclusory claims of wrongdoing. In such instances it is well-settled that: "[o]ne cannot create an issue of fact merely by submitting an affidavit denying averments in conflicting affidavits without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d. Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v.

Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

In this case Victor cannot defeat the Defendants' summary judgment motion regarding their failure to exhaust claims by relying upon mere denials, along with vague suspicions, conclusory allegations and bare assertions. Rather, in order to create an issue of material fact which defeats a summary judgment, the Plaintiff must set forth facts showing that there is a genuine issue for trial. Given the thorough documentation of Victor's grievance histories presented by the Defendants, a thoroughly documented history which actually shows that some grievances as to nine of the Defendants were fully exhausted and must proceed, Victor's cursory denials and speculative claims do not create a genuine issue of material fact which would defeat summary judgment consideration of these exhaustion issues.

Moreover, our analysis of the exhaustion defenses brought by the remaining Corrections Defendants reveal that these arguments are well founded. With respect to these Defendants, there is no record that Victor ever named them in any fully-exhausted grievance. Furthermore, none of the episodes of alleged misconduct referred to by Victor in his complaint, beyond the June 28, 2008 cell extraction assault, have ever been the subject of a fully-exhausted grievance. Therefore, all of the remaining Corrections Defendants are entitled to summary judgment in their favor

on the grounds that Victor has failed to exhaust his claims against them prior to proceeding into federal court.

**C.** **Victor Cannot Hold Prison Supervisors and Officials Personally Liable to Him Simply By Virtue of Their Supervisory Posts or Because He Was Dissatisfied With Their Investigation and Response to His Grievances**

Beyond his failure to exhaust his administrative remedies, Victor's attempts to hold an array of prison supervisors responsible for the alleged misdeeds of their subordinates fails for yet another reason. With respect to claims like these brought against supervisors under the Eighth Amendment, the courts have fashioned an exacting four-part test based upon the reasoning of City of Canton v. Harris, 489 U.S. 378 (1989), for supervisory liability on an Eighth Amendment claim for failure to supervise. Under this test, "the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (3) the injury resulted from the policy or practice." Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). Accordingly, these approaches are summarized as follows:

> In sum, to make out a claim of deliberate indifference based on direct liability (i.e., insofar as the defendants are alleged to have known of and

ignored the particular risk that Whetzel posed, the plaintiffs must meet the test from <u>Farmer v. Brennan</u>: They must show that the defendants knew or were aware of and disregarded an excessive risk to the plaintiffs' health or safety, and they can show this by establishing that the risk was obvious. For the plaintiffs' claims seeking to hold supervisors liable for their deficient policies, <u>Sample's</u> four-part test provides the analytical structure for determining whether the policymakers exhibited deliberate indifference to the plaintiffs' risk of injury, it being simply the deliberate indifference test applied to the specific situation of a policymaker.

Id.

In this setting the Third Circuit has noted that, in order to defeat a motion for summary judgment, a plaintiff alleging deliberate indifference on the part of prison supervisors "must present enough evidence to support the inference that the defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm." <u>Id.</u> at 132. However, a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. Quite the contrary, to state a claim under §1983, the plaintiff must show that the supervisory defendants, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. §1983; <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902 (3d Cir. 1997); <u>see also Maine v.Thiboutot</u>, 448 U.S. 1 (1980). Liability under § 1983 is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of

personal direction or of actual knowledge and acquiescence in the challenged practice.

Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

> In particular, with respect to prison supervisors it is well-established that:
>
> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

Thus, in order to defeat a motion for summary judgment, a plaintiff alleging deliberate indifference on the part of supervisory prison officials "must present enough evidence to support the inference that the defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm." Id. at 132. Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. For example, in O'Connell v. Sobina, No. 06-238, 2008 WL 144199, *21 (W.D. Pa. Jan. 11, 2008), the court rejected an effort to hold supervisors liable for the acts of staff holding that:

> Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a

subordinate's actions. Rode, 845 F.2d at 1207. "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Id. See also Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). Moreover, in order to maintain a claim for supervisory liability, a plaintiff must show: 1) that the supervising official personally participated in the activity; 2) that the supervising official directed others to violate a person's rights; or 3) that the supervising official had knowledge of and acquiesced in a subordinate's violations. See Robinson v. City of Pittsburgh,120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

Similarly, in Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W. D. Pa. 2004), the

court rejected an effort to extend civil rights liability to supervisory officials without

proof of personal involvement or acquiescence in wrongdoing, stating:

Third Circuit case law recognizes that "(a) defendant in a civil rights action must have personal involvement in the alleged wrongs" in order to be liable. Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir.2003) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)). Consequently, a supervisor may be liable under 42 U.S.C. § 1983 for his or her subordinate's unlawful conduct if he or she directed, encouraged, tolerated, or acquiesced in that conduct. See Blanche Road Corp. v. Bensalem Twp., 57 F.3d 253, 263 (3d Cir.1995); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir.1995). However, the mere assertion "that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did" is insufficient to establish liability. Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989). Likewise, a supervisor's mere failure to train, supervise or discipline subordinate officers does not state a basis for a § 1983 claim against the supervisor absent proof of direct participation by the superior in some unlawful conduct. Mobley v. City of Atlantic City Police Dept., No. Civ. A. 97-2086JBS, 2000 WL 363692 at *3 (D.N.J. March 30, 2000) (citing Brown v. Grabowski, 922 F.2d 1097, 1119-20 (3d Cir.1990)).

In this case, with respect to the prison supervisors named in the complaint who are not alleged to have directly participated in this June 28, 2008, cell extraction, Victor's allegations are insufficient to state a claim upon which relief can be granted. Indeed, these claims fail for at least two reasons. First, to the extent that Victor attempts to hold these officials personally culpable based simply upon their supervisory status, his complaint runs afoul of the settled rule that civil rights liability may not be based solely upon notions of *respondeat superior*. It is well-settled that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. Quite the contrary, liability under § 1983 is personal in nature and "cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

Nor can Victor convert his displeasure with these officials' investigation of, or response to, his grievances into an infraction of constitutional dimension. Inmates do not have a constitutional right to a prison grievance system. See Jones, 433 U.S. at 137-138; Speight v. Sims, No. 08-2038, 283 Fed. Appx. 880, 2008 WL 2600723 at *1 (3d. Cir. June 30, 2008) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001)

("[T]he existence of a prison grievance procedure confers no liberty interest on a prisoner."). Consequently, dissatisfaction with response to an inmate's grievances does not support a constitutional claim. See also Alexander v. Gennarini, 144 F. App'x 924 (3d Cir. 2005) (involvement in post-incident grievance process not a basis for § 1983 liability); Pryor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable). See also Cole v. Sobina, No. 04-99J, 2007 WL 4460617, at *5 (W.D. Pa. Dec. 19, 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern."). As the United States Court of Appeals for the Third Circuit recently observed when disposing of a similar claim by another inmate:

> Several named defendants, such as the Secretaries of the Department of Corrections or Superintendents, were named only for their supervisory roles in the prison system. The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988) (defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior* ); see also Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir.1996) (state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause)

> Pressley v. Beard, 266 F.App'x 216, 218 (3d Cir. 2008).

These basic principles apply here, and compel the dismissal of Victor's claims against these Supervisory Defendants, who may not be held liable simply because they were prison supervisors when these events occurred or were alleged to have failed "to take corrective action when grievances or investigations were referred to them." Id.

D.     **Victor's Retaliation and Sexual Harassment Claims Fail as a Matter of Law**

In addition, Victor has lodged a series of disparate claims, couched in general terms, against a variety of correctional officials, broadly alleging without further supporting factual details that these officials either sexually harassed him by making remarks to him, or retaliated against him.

These claims fail for three reasons. First, these claims should be dismissed because Victor inadequately exhausted his administrative remedies with respect to these claims by never adequately identifying any of the alleged harassing parties at any stage of his grievance proceedings.

More fundamentally, Victor's claims fail because Victor has failed to present sufficient evidence to support his assertions regarding the alleged harassment.[2] As an

_____

[2] We find it appropriate to note that we have identified "sexual harassment" in quotation marks not to denigrate Victor's claims – which allege conduct that is plainly inappropriate and degrading – but because the claim is substantially distinct from the more common claims for sexual harassment brought in federal court where an employee alleges that he or she was subjected to unlawful harassment on the basis of sex. Victor's harassment claim is obviously distinct

initial matter, we do not readily perceive how this claim fits under the First, Eighth, or Fourteenth Amendments, which are the exclusive bases for all of the claims that Victor brought in this case. In this regard we note that courts often hold that isolated verbal taunts and threats do not rise to the level of constitutional violations. Wilson v. Horn, 971 F. Supp. 943,948 (E.D. Pa. 1997), aff'd., 142 F.3d 430 (3d Cir. 1998); Maclean v. Secor, 876 F. Supp. 695, 698-699 (E.D. Pa. 1995); McBride v. Deer, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001).

Even if we were generously to interpret this claim to find that Victor was alleging that the harassment constituted a form of retaliation for his exercise of his constitutional rights, we would conclude that there does not exist a sufficient dispute of material fact to allow this claim to proceed. Victor faces a demanding burden of proof in attempting to allege such a retaliation claim. Inmates like Victor frequently invite courts to infer retaliatory motives to other prison actions. Yet, these invitations, while frequently made, are rarely embraced by the courts. Compare DeFranco v. Wolfe, No. 08-1957, 2010 WL 2762968 (3d Cir. July 14, 2010)(denying inmate cell transfer retaliation claim); Alexander v. Fitch, No. 07-1732, 2010 WL 1257709 (W.D. Pa. March 26, 2010)(same); Carpenter v. Kloptoski, No. 08-2233, 2010 WL 891825 (M.D. Pa. March 10, 2010)(same); Solan v. Ranck, No. 06-49, 2007 WL 141918

from these customary claims for sexual harassment.

(M.D.Pa. Jan. 18, 2007)(denying retaliation claim, in part); with Curtician v. Kessler, No. 07-286, 2009 WL 2448106 (W.D. Pa. Aug. 7, 2009)(factual issues preclude dismissal of inmate cell transfer retaliation claim).

Rather, a prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove the following three elements: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). Examples of adverse actions that have, in certain cases, been found to support a retaliation claim include filing false misconduct reports, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001), and placing a prisoner in administrative custody, Allah, 229 F.3d at 225.

The third essential element to a retaliation claim is that there be a causal link between the exercise of a constitutional right and the adverse action taken against the

prisoner. <u>Rauser</u>, 241 F.3d at 333-34. To establish this third, and crucial, component to a constitutional retaliation claim, causation, Victor must make an exacting showing. In this setting:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. <u>See Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir.1997); <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920-21 (3d Cir.1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir.2000).

<u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007). Moreover, when examining these causation issues, we are specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such

activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Id. at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and allegedly retaliatory acts. Indeed, this Court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

> To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir.2002); Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D.Pa. Apr.13, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment rights "played some substantial role" in the defendant's action). The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir.2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir.1997) (stating that "temporal proximity merely provides an evidentiary basis from which an inference can be drawn"). For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)) . . . [T]he

Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n. 5 (3d Cir.2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of . . . wrongdoing, Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir.2003). This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

Conklin v. Warrington Tp., No. 06-2245, 2009 WL 1227950, *3 (M.D.Pa. April 30,2009)

Applying this standard, courts in civil rights cases have frequently rebuffed speculative efforts to infer causation from temporal proximity when a span of weeks or months separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation. Thus, "[o]ur sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation. See Killen v. N.W. Human Servs., Inc., No. 06-4100, 2007 WL 2684541, at *8 (E.D.Pa. Sept.7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell, 206 F.3d at 279 n. 6 (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. 04-2231, 2007 WL 3231969, at *11 (M.D.Pa. Oct.29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. 05-19, 2007 WL 2769718, at *4 (W.D.Pa. Sept.20, 2007) (holding that temporal proximity of three

months was insufficient to establish causation).” Fischer v. Transue, 04-2756, 2008 WL 3981521, *10 (M.D.Pa. Aug. 22, 2008)(holding that temporal proximity of three weeks was insufficient to establish causation).

In practice, application of these legal tenets has often led to the rejection of retaliation claims as legally insufficient when those claims are like the retaliation assertion made here: An assertion of retaliation based solely on circumstantial proof of some temporal link between the plaintiff’s conduct and the defendants’ actions when, in fact, the evidence shows that these events are separated in time. See, e.g., DeFranco v. Wolfe, No. 08-1957, 2010 WL 2762968 (3d Cir. July 14, 2010)(denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Bailey v. Commercial National Insurance Co., 267 F. App’x, 167 (3d Cir. 2008)(employment discrimination-retaliation case, four months temporal proximity insufficient); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient); Conklin v. Warrington Tp., No. 06-2245, 2009 WL 1227950 (M.D.Pa. April 30, 2009)(two months temporal proximity insufficient); Rogers v. Delaware, Dept. of Public Safety/DMV 541 F.Supp.2d 623, 627 (D.Del. 2008)(10 months insufficient); Brown v. Boeing, 468 F.Supp.2d 729 (E.D.Pa. 2007)(3-4 months insufficient); Lumban-Tobing v. Potter, No. 04-979, 2005 WL 2100691

(M.D. Pa. Aug. 30, 2005)(9 months insufficient temporal proximity, but other proof creates factual issue precluding summary judgment).

In this case, beyond generally labeling conduct as retaliatory, Victor has provided no evidence concerning how he establishes this essential causal connection that is the gravamen of a retaliation claim. Indeed, in many instances Victor does not even provide a coherent chronology of events which would enable any fact finder to draw such a causal inference from the widely separated actions, and actors, named in his complaint. Such proof is plainly inadequate to sustain such claims, and the Defendants are entitled to summary judgment on these claims.

### F.   Hearing Examiner Mitchell is Also Entitled to Summary Judgment

Finally, to the extent that Victor seeks to hold hearing examiner Mitchell personally liable for adjudicative decisions which he has made, Victor's claims against this Defendant fail for several reasons. First, as we have noted above, Victor never exhausted any grievance regarding any claims against Defendant Mitchell, the Hearing Examiner who reviewed the Plaintiff's disciplinary proceedings.  We, therefore, conclude that any claims Victor may be attempting to advance against Defendant Mitchell in this action should properly be dismissed for failure to exhaust administrative remedies.

In addition, Defendants argue that Defendant Mitchell is entitled to absolute quasi-judicial immunity from suit in this case. In making this argument, Defendants acknowledge that the United States Supreme Court has previously held that disciplinary hearing examiners are entitled only to qualified immunity, rather than to absolute immunity. See Cleavinger v. Saxner, 474 U.S. 193 (1985). Nevertheless, Defendants urge the Court to find that the factors that led the Supreme Court to its conclusion in Cleavinger that immunity should be limited are not present in this case, because Pennsylvania's hearing examiners are more analogous to judicial or quasi-judicial officers than were the hearing officials at issue in Cleavinger. We find Defendants argument to be potentially persuasive, but need not embrace this argument because we conclude that the record makes abundantly clear that Defendant Mitchell is entitled to summary judgment on Victor's claims, which appear to be that Defendant Mitchell violated the Plaintiff's due process rights through the way in which he heard their misconduct charges and rendered adjudicative decisions with respect to each of them. It is well established that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). The Supreme Court has, however, recognized a set of minimum procedural protections that must apply to prison disciplinary proceedings, including the right to: (1) advance

written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety or correctional goals, to call witnesses and present documentary evidence as part of a defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action. Id. at 563-67.

Due process also requires that a prison disciplinary tribunal be sufficiently impartial. Meyers v Alldredge, 492 F.2d 296, 305-07 (3d Cir. 1974). The requirement of an impartial tribunal "prohibits only those officials who have a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge from sitting on the disciplinary committee." Meyers, 492 F.2d at 306. In the past, inmates have often invited courts find violations of this due process right based upon general assertions of staff bias. Yet, such requests, while frequently made, have rarely been embraced by the courts. Instead, the courts have held that a "generalized critique" of staff impartiality is insufficient to demonstrate the degree of bias necessary to prove a due process violation. Lasko v. Holt, 334 F. App'x 474 (3d Cir. 2009). Furthermore, in the absence of a showing that the hearing officer was "personally or substantially involved in the circumstances underlying [the investigation of the] charge," Greer v. Hogston, 288 F.App'x. 797, 799 (3d Cir. 2008), courts generally decline to sustain due process

challenges to disciplinary decisions on claims of staff bias. See Redding v. Holt, 252 F.App'x 488 (3d Cir. 2007).

A prison disciplinary determination comports with due process if it is based on "some evidence." See Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 454-56 (1985) ("[T]he relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board"). This standard is minimal and does not require examination of the entire record, an independent assessment of the credibility of witnesses, or even a weighing of the evidence. See id. at 455; Thompson v. Owens, 889 F.2d 500, 501-02 (3d Cir. 1989). Therefore, it is well settled that disciplinary decisions are entitled to considerable deference by a reviewing court and must be upheld whenever there is "some evidence" to support the decision. Hill, 472 U.S. at 457; Elkin v. Fauver, 969 F.2d 48 (3d Cir.1992); Thompson v. Owens, 889 F.2d 500 (3d Cir. 1989); Franco v. Kelly, 854 F.2d 584, 588 (2d Cir. 1988); Freeman v. Rideout, 808 F.2d 949, 955 (2d Cir. 1986). Thus, in this setting the "function [of the court] is to determine whether there is some evidence which supports the decision of the [hearing officer]." Freeman, 808 F.2d at 954. As the Supreme Court has observed, the "some evidence" standard is a highly deferential standard of review and:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the

credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

Hill, 472 U.S. at 455-456.

Judged against these standards, we find that Victor has failed adequately to support his claims that Defendant Mitchell or any other Defendant involved in disciplinary proceedings violated his due process rights. It is clear that Victor believes that Defendant Mitchell was biased against him, but Victor offers little to support this claim beyond a "generalized critique" of staff impartiality, which is as a legal matter insufficient to demonstrate the degree of bias necessary to prove a due process violation. Lasko v. Holt, 334 F. App'x 474 (3d Cir. 2009). It also appears undisputed that Victor was given notice of the disciplinary charges, and the opportunity to request witnesses to testify. When witnesses were denied to Victor, reasons were given for the hearing examiner's decision. Further it is not genuinely disputed that Victor was provided written statements regarding the reasons for any discipline imposed and the evidence relied upon in support of the decision. Finally, it seems beyond argument that "some evidence" supported the disciplinary decisions issued.

Thus, we find not only that Victor failed entirely to exhaust his claims regarding the disciplinary process employed at SCI-Huntingdon, but also conclude that the evidence of record is simply insufficient to support Victor's due process

claims. We, therefore, recommend that the Court grant summary judgment in favor of Defendant Mitchell.

In closing, we find that, as to the nine corrections officials directly involved in William Victor's June 28, 2008 cell extraction and the alleged cover-up of the circumstances surrounding that cell extraction, the Plaintiff has presented significant allegations of serious misconduct supported by substantial proof. Moreover, Victor has plainly exhausted his administrative remedies with respect to these claims. These claims, therefore, can and should be tried on their merits. With respect to the remaining Corrections Defendants, however, Victor's claims are unexhausted, and often without merit. Therefore, these remaining Corrections Defendants are entitled to summary judgment on these claims.

## IV. <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED, that the Defendants motion for summary judgment (Doc. 225) be GRANTED as to Defendants Lawler, Harris, Harman, Cooper, Morrison, Lalli, Clapper, Mitchell, Garzarelli, Butler, Miller, Moore, Baird, and Busco.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition

of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 25th day of February, 2011.

_**S/Martin C. Carlson**_
Martin C. Carlson
United States Magistrate Judge