IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**FILED
SCRANTON**

AUG 1 2 2011

PER ⁓⁓⁓⁓⁓
DEPUTY CLERK

WILLIAM VICTOR, : 
          Plaintiff : 
           :    CIVIL NO. 3:08-cv-1374
   v. : 
           :    (JUDGE NEALON)
SCI SMITHFIELD, et al., :    (MAGISTRATE JUDGE CARLSON)
          Defendants : 

## MEMORANDUM and ORDER

On July 21, 2008, Plaintiff, an inmate currently confined in the State Correctional

Institution ("SCI") Coal Township, Pennsylvania, initiated this civil rights action pursuant to 42

U.S.C. § 1983. (Doc. 1). He filed an Amended Complaint on September 26, 2008. (Doc. 16).

Plaintiff alleged, inter alia, that while he was incarcerated at SCI-Huntingdon, prison officials

abused and harassed him in retaliation for filing grievances and a civil lawsuit, failed to provide

medical treatment, and denied him due process at misconduct hearings. (Id.).[1]

On April 14, 2010, Defendants Cooper, Morrison, Stevens, Lalli, Clapper, Mitchell,

Garzarelli, Butler, Maul, Miller, Moore, Baird, Lawler, Fisher, Corbin, Harris, Busco[2], and

Harman ("moving defendants")[3], employees of SCI-Huntingdon, filed a motion for summary

---

[1]The Amended Complaint identified twenty-eight (28) defendants. For the purposes of
this Memorandum, only the names of the moving defendants will be prefaced with "Defendant."

[2]Although the moving defendants spell Defendant Busco as "Busko", this Memorandum
will use the spelling reflected on the docket in order to avoid confusion.

[3]In addition to the moving defendants, summary judgment was requested in favor of
Grove. See (Doc. 226). However, the brief in support of the motion for summary judgment
stated: "[s]eparate counsel has entered his appearance for ... Grove, ...after the undersigned
counsel was granted leave to withdraw his appearance...." (Doc. 226, p. 2). Accordingly, the
Magistrate Judge did not make a recommendation as to Grove, see (Doc. 331, p. 42), and this
Memorandum will not address Plaintiff's claims against Grove.

judgment, a brief in support, and a statement of facts. (Docs. 225-228).[4] Plaintiff filed a brief in

opposition to the motion and an answer to the statement of facts on April 22, 2010. (Docs. 241-

242). On February 25, 2011, Magistrate Judge Martin C. Carlson filed a Report and

Recommendation ("R&R") recommending that the motion be granted. (Doc. 331). Plaintiff

filed objections to the R&R on March 4, 2011. (Docs. 333, 336). He objects to the

recommendations as to Defendants Cooper, Busco, Miller, Moore, Lawler, Morrison, Harris, and

Harman.[5] (Doc. 333, pp. 1, 10-11). However, Plaintiff now "waive[s] any claims against

Defendants Lalli, Butler, Garzarelli, Mitchell, Clapper, and Baird."[6] (Id.); see also (Doc. 342, p.

1). On March 16, 2011, Defendants filed a brief in opposition to the objections. (Doc. 341).

Plaintiff's reply brief was filed on March 23, 2011. (Doc. 342). The matter is ripe for

disposition and, for the reasons set forth below, the R&R will be adopted in part.

## Background

The Amended Complaint alleged that Defendants Morrison, Lawler, Harris, Busco, and

Harman had knowledge that Plaintiff was being sexually harassed by corrections officers in

retaliation for filing complaints and failed to protect him. (Doc. 16, p. 4). Additionally, the

Amended Complaint alleged that, on June 28, 2008, Goodman, Lehman, Grove, Plummer, Pyle,

---

[4]On May 12, 2010, pursuant to agreement of the parties, Defendants Fisher, Corbin, Stevens, and Maul were dismissed from the Amended Complaint and terminated as parties to the action. (Doc. 267).

[5]Plaintiff also objects to summary judgment being awarded in favor of Wilt and Albright, but they are not movants in the motion at hand. (Doc. 333). Accordingly, neither the R&R nor this Memorandum addresses the claims made against them.

[6]Based on Plaintiff's waiver of his claims, summary judgment will be entered in favor of these defendants and they will not be discussed further herein.

2

Eberling, Diffin, Ritchie, Snyder, and Defendants Cooper, Moore, Miller, and Busco conspired to

brutally attack Plaintiff in three locations of the Restrictive Housing Unit ("RHU") at SCI-

Huntingdon. (Id. at p. 5). Plaintiff alleged that Grove, Lehman, Plummer, Pyle, and Eberling

kicked, punched, tortured with electricity, and violently beat him, causing a broken jaw and other

injuries. (Id.). The Amended Complaint alleged that a noose was planted in Plaintiff's cell to

support Defendants' falsified account of the incident, namely that Plaintiff's injuries were self-

inflicted and/or occurred when they entered Plaintiff's cell to save him from a suicide attempt.

(Id.). Plaintiff claimed that Defendants Cooper, Moore, Miller, and Busco conspired to cover-up

the attack. (Id.). He alleged that Defendant Busco failed to stop the assault due to his

participation in its planning and/or execution. (Id.). Further, the Amended Complaint alleged

that Defendants Cooper, Moore, and Miller refused or delayed medical treatment and entered

false information into Plaintiff's medical records to cover up the assault. (Id.).

**Standard of Review- Objections to R&R**

When objections to a report and recommendation have been filed under 28 U.S.C. §

636(b)(1)(C), the district court must make a de novo review of those portions of the report to

which specific objections are made. Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989);

Goney v. Clark, 749 F.2d 5, 6-7 (3d Cir. 1984) ("providing a complete de novo determination

where only a general objection to the report is offered would undermine the efficiency the

magistrate system was meant to contribute to the judicial process"); Mutombo v. Carl, 2003 U.S.

Dist. LEXIS 27124 (M.D. Pa. 2003) (Kane, J.). If no objections are made to a report, the district

court is not required to review the magistrate judge's factual or legal conclusions under a de novo

or any other standard. Thomas v. Arn, 474 U.S. 140, 149 (1985). Nevertheless, it is better

practice to afford some level of review to dispositive legal issues raised by the report. Peter v. Wynder, 2008 U.S. Dist. LEXIS 57782, *4-5 (M.D. Pa. 2008) (Jones, J.) (citing Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987), writ denied 484 U.S. 837 (1987)). In the absence of objections, review may properly be limited to ascertaining whether there is clear error that not only affects the rights of the plaintiff, but also seriously affects the integrity, fairness, or public reputation of judicial proceedings. Cruz v. Chater, 990 F. Supp. 375, 377 (M.D. Pa. 1998) (Vanaskie, J.); Garcia v. I.N.S., 733 F. Supp. 1554, 1555 (M.D. Pa. 1990) (Kosik, J.) (stating "the district court need only review the record for plain error or manifest injustice"). The district court may accept, reject, or modify, in whole or in part, the findings and recommendations contained in the report. 28 U.S.C. § 636(b)(1)(C); M.D. Pa. Local Rule 72.3.

## Standard of Review- Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); (Doc. 331, pp. 13-14). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990). "Inferences should be

drawn in the light most favorable to the non-moving party, and where the non-moving party's

evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple

BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied

507 U.S. 912 (1993).

## Discussion

### A.     Exhaustion

### *1.     DC-ADM 804*

In their brief in support of the motion for summary judgment, the moving defendants

alleged that "Plaintiff failed to exhaust his available administrative remedies with respect to the

Corrections Defendants ... [by failing] to grieve the subject matter of his allegations against these

Defendants or to appeal the grievances in accordance with the Department's Inmate Grievance

Policy." (Doc. 226, pp. 4, 7) (citing DC- ADM 804 and arguing that Pennsylvania's "inmate

grievance policy requires that the inmate identify all persons with information relevant to the

issues raised in the grievance"). They claimed that Plaintiff appealed six (6) grievances to final

review, but only one of them, grievance no. 235059, related to the alleged excessive use of force

on June 28, 2008, which is the focus of the Amended Complaint. (Id. at p. 7). The moving

defendants asserted that, except for Defendant Cooper, Plaintiff failed to name them in this

grievance and that summary judgment should be entered in their favor. (Id. at pp. 4, 7).

The R&R concluded that "the exhaustion defenses brought by the remaining

Corrections Defendants [the moving defendants] reveal that these arguments are well founded"

and that they are entitled to summary judgment. (Doc. 331, pp. 15-24). Magistrate Judge

Carlson determined that only one of Plaintiff's fully-exhausted grievances raised the claims at

issue in this action. (Id. at pp. 11-13). Specifically, the Report stated, "it is evident that Victor alleged in one fully-exhausted grievance that he was subject to excessive use of force in the RHU on June 28, 2008. That grievance, however, only appears to identify Corrections Defendants Diffin, Eberling, Goodman, Lehman, Plummer, Snyder, Grove, Pyle, and LPN Ritchey as participants in this conduct." (Id. at pp. 20-21). The Magistrate Judge found that "there is no record that Victor ever named [the moving defendants] in any fully-exhausted grievance." (Id. at p. 23). The R&R concluded, in light of Dorian Varner's sworn affidavit documenting Plaintiff's grievance history, that Plaintiff's conclusory denials and speculative claims that some grievances were lost or destroyed were insufficient to overcome the exhaustion requirement. (Id. at pp. 21-22) ("'[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient.' Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969)"). Accordingly, Magistrate Judge Carlson recommended that summary judgment be entered in favor of all the moving defendants for Plaintiff's failure to exhaust. (Id. at pp. 23-24).

Plaintiff objects to the Magistrate Judge's conclusion that he did not name any of the moving defendants and points out that grievance no. 235059 did name Defendants Cooper, Miller, Moore, and Lawler. (Doc. 333, pp. 7-8). He states that the grievance specifically identified Defendants Cooper, Miller, and Moore as having denied him medical treatment on June 28, 2008. (Id.). Plaintiff claims that Defendant Lawler was directly named in the final appeal of this grievance. (Id.). In response, the moving defendants claim that grievance no. 235059 only named Diffin, Ritchey, Plummer, Grove, Pyle, Lehman, Eberling, Goodman, and Defendant Cooper. (Doc. 341, p. 6).

6

In his objections to the R&R, Plaintiff further asserts that the Pennsylvania Department of Corrections ("DOC") inmate grievance form does not require an inmate to identify the names of the parties against whom a grievance is filed and that SCI-Huntingdon did not have an appeal form. (Doc. 333, pp. 2, 4, 6-7), citing Espinal v. Goord, 558 F.3d 119, 127 (2d Cir. 2009) (concluding that neither New York's grievance procedures nor the PLRA requires prisoners to identify the individuals responsible for alleged misconduct for exhaustion purposes). He cites Jones v. Bock, 549 U.S. 199 (2007), for the holding that a prisoner need not name all responsible parties in a grievance to fully exhaust a claim. (Doc. 333, p. 6). The Jones court stated:

> In Woodford, we held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," 548 U.S., at 88, 126 S. Ct. 2378, 165 L. Ed. 2d 368, 377 --rules that are defined not by the PLRA, but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. As MDOC's procedures make no mention of naming particular officials, the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion is unwarranted.

Jones, 549 U.S. at 218. In response, the moving defendants submit that unlike the grievance system of the Michigan DOC that was considered in Jones, Pennsylvania does require an inmate to name all defendants in his grievance. (Doc. 341, p. 6), citing DC-ADM 804; Spruill v. Gillis, 372 F.3d 218, 234 (3d Cir. 2004) ("Spruill has procedurally defaulted a claim against Brown by failing to identify him.").

This Court will conduct de novo review of the exhaustion issue.

The Prison Litigation Reform Act of 1995 ("PLRA"), as amended 42 U.S.C. § 1997e, requires prisoners to present their claims through an administrative grievance process before

seeking redress in federal court. The Act specifically provides, "[n]o action shall be brought with respect to prison conditions under ... 42 U.S.C. 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must comply with the PLRA exhaustion requirement as to any claim that arises in the prison setting, regardless of the nature of the claim or of the relief sought. Porter v. Nussle, 534 U.S. 516, 532 (2002); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001). "[I]t is beyond the power of ... any ... [court] to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000). Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002) (reasoning that "[p]rison officials are likely to have greater legal expertise and, as important, superior access to prison administrative records in comparison to prisoners"). Further, the PLRA mandates that an inmate "properly" exhaust administrative remedies before filing suit in federal court, which demands compliance with an agency's deadlines and other procedural rules. Woodford v. Ngo, 548 U.S. 81, 92 (2006); Spruill, 372 F.3d at 230 (concluding that the PLRA includes a procedural default component). A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. McKinney v. Kelchner, 2007 U.S. Dist. LEXIS 71958, *8 (M.D. Pa. 2007) (Rambo, J.) (citing Spruill, 372 F.3d at 227-32; Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000)).

In the instant action, Dorian Varner is the Chief Grievance Officer responsible for receiving and processing inmate appeals. (Doc. 228, p. 81). Her affidavit stated that between

8

November 1, 2007 and November 1, 2008, Plaintiff appealed six grievances to final review, to wit, grievance nos. 220597, 235059, 242418, 242596, 243577, and 244747. (Doc. 228, p. 82) (attaching grievance forms as exhibits). An independent review of these grievances confirms the Magistrate Judge's conclusion that only one of these fully-exhausted grievances, grievance no. 235059, relates to the issues raised in the Amended Complaint.[7] See (Doc. 331, pp. 20-21). In grievance no. 235059, Plaintiff alleged that he was assaulted on June 28, 2008, and then denied medical care. (Doc. 228, pp. 93-101). He claimed that staff members conspired to cover up the assault by, inter alia, creating a fictitious story that Plaintiff was attempting suicide, planting a noose in his cell, not photographing his injuries, and falsifying his medical records. (Id.).

This Court will also adopt Magistrate Judge Carlson's determination that, in light of the thoroughly documented grievance histories presented by the moving defendants, Plaintiff cannot defeat a summary judgment motion by alleging that he exhausted other claims without some evidence to support his bare assertion. See (Doc. 331, p. 23). Accordingly, Plaintiff's claims that Defendants Morrison, Lawler, Harris, Busco, and Harman knew Plaintiff was being sexually harassed by corrections officers in retaliation for filing complaints, that he was denied food, yard time, and cleaning supplies, and that they failed to protect him, will be dismissed. See (Doc. 16, p. 4); (Doc. 228, pp. 33-34, 57, Plaintiff's deposition) (testifying that he appealed grievances on these claims to final review, but did not have any documentation to support this allegation).

However, this Court disagrees with the Magistrate Judge's finding that grievance no. 235059 was limited to Diffin, Eberling, Goodman, Lehman, Plummer, Snyder, Grove, Pyle, and

---

[7]The remaining grievances, nos. 220597, 242418, 242596, 243577, and 244747, complain about the medical care Plaintiff received from Dr. Long or challenge the reduction in funds in Plaintiff's inmate account by Rivello. (Doc. 228, pp. 81-140).

Ritchey. (Doc. 331, pp. 20-21). Rather, after de novo review, it is determined that this grievance also named Maul and Defendants Cooper, Morrison, Moore, Miller, and Lawler. See (Doc. 228, pp. 96-101); McKinney, 2007 U.S. Dist. LEXIS 71958 at *11-12 (rejecting the defendants' argument that because the grievance did not specifically state that the complaint was "'on' them", as it did for two other officials, that it did not provide adequate notice). Defendants Cooper, Morrison, Moore, and Miller were specifically identified in the initial grievance for their allegedly improper conduct on June 28, 2008. (Id.) (Defendant Vickie Moore is referred to as Nurse Vickie.). The first appeal of grievance no. 235059 again named Defendants Miller and Moore and the final appeal of this grievance identified Defendant Lawler as allegedly allowing the abuse. (Id.). Although Plaintiff's reliance on Espinal, 558 F.3d 119, is misplaced, his objection to the Magistrate Judge's determination that he failed to name any of the moving defendants in a fully-exhausted grievance will be sustained as to Defendants Cooper, Morrison, Moore, Miller, and Lawler.

This leaves Defendants Busco, Harris, and Harman for consideration. In his objections to the R&R, Plaintiff alleges that at the time grievance no. 235059 was filed, he was not able to identify all the participants in the June 28, 2008 assault. (Doc. 333, pp. 2, 4, 9). Plaintiff argues that because five (5) of his attackers wore masks, he did not know their identities and could not name them in a grievance. (Id.). Plaintiff claims that he did not learn about Defendant Busco's involvement in the attack until he read in the Office of Professional Responsibility ("OPR") investigation reports that Defendant Busco opened the door to Plaintiff's cell on June 28, 2008, letting in his alleged attackers. (Id.); see also Exhibit D (Memorandum of Interview with Busco dated October 15, 2008). Further, Plaintiff alleges, inter alia, that Defendants Harris and Harman

10

controlled the prison's security office and knowingly destroyed videotape evidence of the assault. (Doc. 333, pp. 4-5). Plaintiff claims that when he filed the grievance, he was unaware that video evidence of the incident had been tampered with and he could not have named these Defendants at that time. (Id. at p. 8).

In response, the moving defendants cite Spruill for the limited holding that an inmate's failure to identify a defendant in a grievance results in the procedural default of a claim against that defendant. (Doc. 341, p. 5). But, they fail to discuss the Spruill court's qualification that this identification need only be made "if practicable" and its conclusion that procedural default can be excused. (Id.) (citing Spruill, 372 F.3d 218). As to Defendant Busco, the moving defendants argue that not only was Defendant Busco not identified by name, the grievance did not refer to anyone in the control room responsible for opening the door to Plaintiff's cell on June 28, 2008. (Id.). With the exception of Grove, who is not a movant in the underlying summary judgment motion, the moving defendants fail to specifically discuss any other defendant. (Id.).

In Spruill, the Supreme Court determined that DC-ADM 804 requires an inmate to identify specific persons in the grievance "if practicable". Id. at 234. It is only the "unexplained failure to identify a responsible prison official in a grievance [that] constitutes a procedural default of the claim." Freeman v. Dep't of Corr., 2011 U.S. Dist. LEXIS 17045, *12 (M.D. Pa. 2011) (Munley, J.) (citing Spruill, 372 F.3d at 230). Additionally, the Spruill court concluded that "the prison can excuse an inmate's failure to [name an individual] by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance." Spruill, 372 F.3d at 234 (reasoning that while the "point is close ..., the grievances and the suit are about a larger-scale denial of adequate medical care, in which prison

11

officials clearly knew Brown was alleged to be implicated"). The Court explained that the "purpose of the regulation here is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing." (Id.).

In Robinson, an inmate challenged prison policy at SCI- Pittsburgh, which required prisoners in the RHU to be taken outside for exercise two at a time and placed in a cage together. Robinson v. Johnson, 343 Fed. Appx. 778 (3d Cir. 2009). The inmate, who was assaulted in the cage, filed a grievance about the incident against "those responsible for this neglect" and requested a change in procedures. Id. at 780. He later filed a civil action naming, inter alia, Horn, in his capacity as the secretary of the DOC, and Johnson, the superintendent of SCI- Pittsburgh. Id. The Court of Appeals reversed an award of summary judgment in the defendants' favor because it did "not believe that Robinson procedurally defaulted his claims against Horn and Johnson." Id. at 782. The Court reasoned that the defendants' names were not facts relevant to the grievance and that the defendants did not meet their burden of demonstrating that it was "practicable" for Robinson to identify them as the relevant policymakers. Id. at 781. The appellate court noted that Robinson did not have access to the policies and procedures governing the administration of security in the RHU, the identities of the prison officials responsible for formulating and implementing those policies, and that during discovery, Johnson objected to Robinson's request for production of the procedures manual. Id. Additionally, the Court of Appeals concluded that the prison's grievance process excused those procedural defaults. Id. at 782. The Initial Review Response to Robinson's grievance stated: "yard procedures for R.H.U. inmates has been modified" and at the second stage of review, Johnson responded: "It is unfortunate that this assault happened to you at SCI-Pittsburgh, but RHU yard

12

procedures have been modified to prevent something like this from happening again." Id. The Court of Appeals concluded that these "documents indicate that Robinson's grievance succeeded in this purpose, 'evidenc[ing] knowledge on the part of prison officials . . . that there was a problem,' and acknowledging that the relevant policymakers, Horn and Johnson, were 'fairly within the compass' of Robinson's grievance." Id. (internal citations omitted).

In Chimenti, the United States District Court for the Middle District of Pennsylvania denied defendant Horn's request for summary judgment despite the plaintiff's failure to name him in a grievance. Chimenti v. Mohadjerin, 2008 U.S. Dist. LEXIS 48379 (M.D. Pa. 2008) (Vanaskie, J.). Therein, it was alleged that for a period of two (2) years the plaintiff was not receiving necessary medical treatment at SCI-Huntingdon for his Hepatitis C because the DOC and Wexford Health Services could not reach an agreement on Rebetron treatment. Id. Chimenti claimed that by the time he received Rebetron, his liver had become severely damaged; thus, he filed a civil suit. Id. It was undisputed that the plaintiff exhausted administrative remedies with respect to the Rebetron treatment, but never named defendant Horn, the former Secretary of the Pennsylvania DOC. Id. Nevertheless, the Court concluded that Chimenti "has adequately explained his failure to name Horn: he was not aware of Horn's involvement until his appeal was pending and an inmate may only file a single grievance for a particular matter." Id. at *13. The Court held that "Chimenti has explained why it was not 'practicable' to name Horn at the time his grievance was being processed, and this explanation suffices to excuse the failure to name him." Id. (citing Spruill, 372 F.3d at 234). The Chimenti court denied Horn's request for summary judgment, reasoning that the "grievance clearly set forth the substance of [Plaintiff's] present claim against Horn, i.e., that he was delayed receiving needed medical treatment due to

13

the failure of the DOC to timely approve a protocol for Rebetron treatment." Id. at *14.

After review in the instant action, it is concluded that Plaintiff has adequately explained why it was not "practicable" for him to name Defendants Busco, Harris, and Harman when he filed grievance no. 235059 on July 4, 2008. Accepting Plaintiff's statements as true, see Chimenti, 2008 U.S. Dist. LEXIS 48379 at *13, he did not became aware of Defendant Busco's involvement until the final appeal of this grievance was pending. See (Doc. 228, pp. 93, 96); (Doc. 259, Ex. B, p. 7, Memorandum of Interview with Defendant Busco dated October 15, 2008). Also, it is undisputed that more than twenty (20) hours of video from June 29, 2008, no longer exist. (Doc. 218, Exhibit 1, Defendant Morrison declaration) (The moving defendants assert that this was not done intentionally and that videotapes are recycled regularly.). Defendant Morrison declared that this discovery was not made until sometime after August 26, 2008, which is the date Plaintiff's first appeal of grievance no. 235059 was denied. (Id.); (Doc. 228, p. 101). Because "an inmate may only file a single grievance for a particular matter" and the challenged conduct of Defendants Busco, Harris, and Harman is directly related to the events of June 28, 2008, Plaintiff could not have filed a separate grievance after acquiring this additional information. Chimenti, 2008 U.S. Dist. LEXIS 48379 at *13.

Moreover, "the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." Jones, 549 U.S. at p. 219 (quoting Johnson v. Johnson, 385 F.3d 503, 522 (5th Cir. 2004)). Grievance no. 235059 accomplished that goal. See Williams v. Beard, 482 F.3d 637, 640 (3d Cir. 2007) (excusing the plaintiff's procedural default against defendant Hollibaugh for failing to name him in the grievance and reversing the grant of summary judgment). The grievance alleged that, on June 28,

14

2008, Plaintiff "was attacked by several staff members dressed in riot gear who entered [his] cell", that correctional officers and medical staff "lied ... to justify entry", that the camera was taken off him "so they could beat and cho[ke Plaintiff]", that the "CO's kept blocking torture", and that he was denied medical treatment for his broken jaw. (Doc. 228, pp. 97-98) (emphasis in original). Thus, the DOC was aware of the alleged misuse of force by multiple staff members, of the alleged deliberate indifference to Plaintiff's medical needs by prison and medical staff, and that prison security cameras might show at least part of the incident. In none of the responses to this grievance, does the DOC limit the allegations to particular individuals; rather, the DOC acknowledged the need to investigate an allegation of abuse by several staff members. See (Doc. 228, pp. 93, 99, 101); (Doc. 241, p. 124). Consequently, the moving defendants' argument that Plaintiff failed to exhaust administrative remedies under DC-ADM 804 by not identifying them in grievance no. 235059 will be rejected.

Notably, "a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court." Oriakhi v. United States, 165 Fed. Appx. 991, 993-94 (3d Cir. 2006). However, the moving defendants have not raised this issue. See Ray, 285 F.3d at 295 ("Administrative exhaustion ... is an affirmative defense that must be pleaded and proven by the defendants."). The moving defendants did not plead exhaustion in their motion to dismiss, (Doc. 22), and only generally asserted the defense in their Answer to the Amended Complaint, (Doc. 33) (filed February 3, 2009). Thereafter, extensive motions proceedings and discovery pursued before the moving defendants filed a motion for summary judgment on April 14, 2010. The motion, which is the subject of this Memorandum, alleged that Plaintiff failed to exhaust administrative remedies by not identifying

15

the moving defendants in a fully exhausted grievance. See (Doc. 226) (emphasis added).  The

moving defendants did not and have not pled the affirmative defense of failure to timely exhaust

administrative remedies, nor did any of the other twenty-eight (28) named defendants. See Baker

v. Beard, 2006 U.S. Dist. LEXIS 41441, *10-13 (M.D. Pa. 2006) (Jones, J.) (concluding that the

corrections defendants, who waited until summary judgment to assert their exhaustion defense,

raised exhaustion "at an appropriate point in time since they [did] so prior to adjudication and

since the Plaintiff will not suffer any appreciable prejudice if the Corrections Defendants are

permitted to utilize this defense") (emphasis added); Stevenson v. Hochberg, 2009 U.S. Dist.

LEXIS 44307 (D. N.J. 2009) (finding that where the case had progressed to the point where

dismissal based upon failure to exhaust administrative remedies would prejudice the plaintiff, the

defendant waived his right to assert the defense).  This Court's sua sponte dismissal on

untimeliness grounds at such a late stage of the proceedings[8] would prejudice Plaintiff.

Therefore, "equitable considerations warrant review of the claim." See McKinney, 2007 U.S.

Dist. LEXIS 71958 at *8.

Furthermore, it may be concluded that Plaintiff exhausted administrative remedies

pursuant to DC-ADM 001 when he filed a complaint directly with the OPR on July 10, 2008,

prior to initiating the instant civil action. See (Doc. 241, Exhibit E at pp. 13-14).

## 2.   *DC-ADM 001*

"The Pennsylvania DOC has established several methods by which Pennsylvania inmates

can grieve their claims of abuse before seeking redress in federal court." Knauss v. Shannon,

---

[8]Plaintiff's claims are governed by a two-year statute of limitations. See Pa. C.S.A. §
5524; Walker v. Fisher, 150 Fed. Appx. 160, 161 (3d Cir. 2005).

16

2010 U.S. Dist. LEXIS 12496, *22 (M.D. Pa. 2010) (Rambo, J.). In addition to complying with the inmate grievance system in DC-ADM 804, an inmate may report abuse "verbally or in writing to any staff member" or "report it in writing to the [OPR]." (Id.); (Doc. 241, pp. 94-103 (DC-ADM 001- Inmate Abuse Allegation Monitoring). Allegations of abuse may also be reported by "an employee, contractor, visitor, volunteer, or any individual who has business with or uses the resources of the department" and/or "all persons and entities attempting, establishing, or maintaining contact with persons committed to the custody of the department." (Doc. 241, pp. 96-97) (DC-ADM 001 (VI)(B)). Pursuing a "grievance to the OPR under DC-ADM 001, is the only step [an inmate has] to take under that policy." Knauss, 2010 U.S. Dist. LEXIS 12496 at *25; see also McKinney v. Zihmer, 2010 U.S. Dist. LEXIS 27243, *16 (M.D. Pa. 2010) (Rambo, J.) (holding that despite the plaintiff's failure to raise all claims via DC-ADM 804, the OPR's consolidated investigation with the Security Office satisfied the PLRA's exhaustion requirement by way of DC-ADM 001); Carter v. Klaus, 2006 U.S. Dist. LEXIS 93031 (M.D. Pa. 2006) (Caldwell, J.) (denying the defendants' motion for summary judgment, which was based solely on the plaintiff's failure to completely exhaust administrative remedies under DC-ADM 804 because the plaintiff pursued his grievance to the OPR under DC-ADM 001).

Here, on July 10, 2008, Plaintiff's attorney sent a letter to the OPR, enclosing a written statement from Plaintiff reporting the alleged abuse on June 28, 2008, and requested that any video evidence be preserved. (Doc. 241, pp. 77-78). This letter was copied to, inter alia, Defendant Lawler. (Id.). This action satisfied DC-ADM 001.[9]

---

[9]Plaintiff also completed an Inmate's Request to Staff Member detailing his alleged assault and requesting that videos and witness statements be timely secured. (Doc. 241, p. 81). The form is dated July 3, 2008, but Plaintiff made a notation on the top on July 14, 2008. (Id.).

Pursuant to DC-ADM 001, "[a]n investigation assigned to the OPR shall be completed within 30 working days of receipt of the investigative order." (Doc. 241, p. 102).[10] Although Plaintiff did not wait until thirty (30) days had expired before he initiated the instant action, it is unclear from the record when the investigations were actually completed. In the initial review response to grievance 235059, dated July 4, 2008, Corporeal Wakefield advised that the Security Office had initiated an allegation of abuse investigation to be completed pursuant to DC-ADM 001. (Doc. 228, p. 99). On July 30, 2008, Defendant Morrison, Security Lieutenant, addressed a letter to Plaintiff stating that "after ... investigating this matter, the findings of my investigation are: Staff acted appropriately prior to and during the extraction on June 28, 2008" and that his report would be forwarded to the OPR. (Doc. 241, p. 124). However, in response to Plaintiff's appeal of grievance no. 235059, Defendant Lawler wrote on August 26, 2008 that the "Security Office has informed me that the investigation is not yet complete." (Doc. 228, p. 101). In the final appeal decision, dated October 29, 2008, Dorian Varner informed Plaintiff that "the investigation was forwarded to the [OPR] for their review ... and the investigation is not completed." (Doc. 228, p. 93). In a motion filed by the moving defendants' counsel on July 23, 2009, counsel states that the OPR completed its investigation and rendered its conclusions on

---

The form is not signed by a staff member to acknowledge receipt, but the moving defendants have offered nothing to suggest the form was not in fact submitted. Although not determinative to this Court's decision, this action would also satisfy DC-ADM 001. Additionally, in his reply to the brief in opposition to objections, Plaintiff argues that the moving defendants violated policy DC-ADM 001 on June 28, 2008, by not photographing his injuries. (Doc. 342, p. 4).

[10]DC-ADM 804 requires the grievance officer to respond within ten (10) working days of receipt of the grievance with a determination as to whether the grievance is frivolous. A ten (10) day extension may be authorized if investigation of the grievance is ongoing. Further, the policy provides that grievances dealing with allegations of inmate abuse shall be handled in accordance with DC-ADM 001.

December 16, 2008. (Doc. 114, p. 5).

In <u>Knauss,</u> the plaintiff argued that his failure to exhaust prior to initiating suit should be excused because the OPR had not responded to his assault complaints. <u>Knauss,</u> 2010 U.S. Dist. LEXIS 12496. The plaintiff alleged that he was assaulted on June 12, 2008; however, "in November 2008, months after he filed his complaint," he still had not received a response from the OPR. (<u>Id.</u>). The Court explained that under the DC-ADM 001 policy in effect at that time, when an inmate filed a report with the OPR, an "investigation assigned to the OPR shall be completed within 30 working days of receipt of the investigative order." (<u>Id.</u> at *26) (citing DC-ADM 001, General Procedures, Part D(7)). The Court concluded that because the "[d]efendants have not provided the court with any documentation in support of a timely investigation and findings completed by the OPR, the court finds that Knauss has set forth a compelling reason to excuse compliance with the exhaustion requirement for his claims relating to the June 12, 2008 incident." (<u>Id.</u> at *27).

Here, the record contains contradictory reports as to when the Security Office completed its investigation. Further, by the moving defendants' own admission, the OPR investigation was not completed for at least five (5) months and they have not documented approval for additional time to complete the investigation. Accordingly, Plaintiff's claims regarding the events of June 28, 2008 will be reviewed on their merits.

**B.     Claims against Supervisory Defendants Lawler, Morrison, Harris, Harman**

Magistrate Judge Carlson concluded that because Defendants Lawler, Morrison, Harris, and Harman may not be held liable for merely failing to take corrective action when grievances or investigations were referred to them, Plaintiff's claims against these Defendants in their

supervisory roles should be dismissed. (Doc. 331, pp. 9-10, 24-30). The R&R explained that Defendant Lawler is accused of not adequately responding to Plaintiff's complaints or objecting to Defendant Morrison's investigative findings. (Id.). The Magistrate Judge determined that Plaintiff's claims against the other supervisory defendants, Defendants Morrison, Harris, and Harman, are that they should be held personally liable because they either supervised staff members who committed the alleged attack on June 28, 2008, or because they failed to adequately investigate Plaintiff's complaints. (Id.).

Magistrate Judge Carlson determined that to state an Eighth Amendment claim for deliberate indifference, a plaintiff needs to "present enough evidence to support the inference that the defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm." (Doc. 331, p. 25) (quoting Beers-Capitol, 256 F.3d at 132). The R&R stated that "[l]iability under § 1983 is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice." (Id. at pp. 25-27) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)); Rode, 845 F.2d at 1207 ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior."). "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Rode, 845 F.2d at 1207. To hold a supervisor liable for the acts of his/her staff, a plaintiff "'must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to

that risk; and [4] the injury resulted from the policy or practice.'" (Doc. 331, pp. 24-25) (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001)). Alternatively, a plaintiff may "show either that (1) the supervisor directly participated in violating a plaintiff's constitutional rights, (2) that he directed others to do so, or (3) as the officer in charge, the supervisor had knowledge of and acquiesced in constitutional violations committed by subordinates." Zimmerman v. Schaeffer, 654 F. Supp. 2d 226, 253 (M.D. Pa. 2009) (Rambo, J.) (citing Beers-Capitol, 256 F.3d at 134); (Doc. 331, pp. 26-27).

Magistrate Judge Carlson concluded that Plaintiff failed to allege direct participation by the prison supervisors. (Doc. 331, p. 28). The R&R reasoned that to the extent Plaintiff attempted to hold these Defendants personally culpable based simply upon their supervisory status, the Amended Complaint "runs afoul of the settled rule that civil rights liability may not be based solely upon notions of respondeat superior." (Id.). Further, because inmates do not have a constitutional right to file grievances, Plaintiff's dissatisfaction with the investigation of, or response to, such grievances does not support a constitutional claim. (Id. at pp. 28-29) (citing Alexander v. Gennarini, 144 F. App'x 924 (3d Cir. 2005)).

In his objections, Plaintiff alleges that Defendants Lawler, Morrison, Harman, and Harris failed to adequately supervise and that they conspired to cover up the assault, allowing video evidence to be destroyed. (Doc. 333, p. 10); see also (Doc. 16, pp. 4-5, Amended Complaint). Plaintiff alleges that eleven (11) of the fourteen (14) hours of video of him in the suicide observation cell were erased and that Defendants Morrison, Harris, and Harman were in full control of the security office and no one could access and/or erase video recordings without their supervision. (Doc. 333, pp. 4-6). He further claims that Defendants ignored his complaints and

21

failed to adequately investigate. (Id. at p. 6); (Doc. 16, p. 4); (Doc. 228, pp. 49-54, 57). Plaintiff alleges that Defendants Morrison, Harris, Harman, and Lawler were aware that BOP policy required photographs of his injuries be taken and videotapes be preserved, but they were not. (Doc. 333, p. 4)

The moving defendants respond that Plaintiff's allegations against Defendant Lawler regarding the investigation of his abuse complaint and Defendant Lawler's concurrence with Defendant Morrison's findings cannot form the basis of liability. (Doc. 341, p. 10). They argue that Plaintiff's mere disagreement with how the investigation was handled by Defendants Harman and Morrison in the Security Office is insufficient and that Plaintiff failed to present any evidence to support his claim that they conspired to cover up the attack. (Id. at pp. 10-11). The moving defendants contend that the mishandling of an inmate grievance does not amount to a constitutional violation. (Id.), citing Wilson v. Horn, 971 F. Supp. 943, 947 (E.D. Pa. 1997) ("Prisoners are not constitutionally entitled to a grievance procedure and the state creation of such a procedure does not create any federal constitutional rights.")

After de novo review, this Court agrees with the R&R that Plaintiff failed to allege personal involvement by Defendants Lawler, Morrison, Harris, and Harman.

Supervisory liability may only be imposed if the supervisor played an affirmative part in the alleged misconduct, which requires something more than after the fact knowledge that constitutional violations occurred. Luciano v. Fago, 2010 U.S. Dist. LEXIS 124204, *20 (M.D. Pa. 2010) (Rambo, J.), citing Brooks v. Beard, 167 Fed. Appx. 923, 925 (3d Cir. 2006) (holding that an inmate's allegation that prison officials responded inappropriately to a grievance did not establish that they were involved in the underlying unconstitutional conduct). "[I]t is not enough

22

for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." Sample, 885 F.2d at 1118.  To support an action for failure to supervise, a plaintiff must establish contemporaneous knowledge of the offending incident, or knowledge of a prior pattern of similar incidents, and circumstances under which the supervisor's actions or inactions could be found to have communicated a message of approval to the offending subordinate.  Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998) (citing Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997)).  "To establish liability on a failure to train theory, a plaintiff must establish that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." Johnson v. Medlock, 2011 U.S. Dist. LEXIS 8396, *31 (W.D. Pa. 2011) (citing Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001)).  Further, "a supervising public official has no affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates." See Miskovitch v. Hostoffer, 2010 U.S. Dist. LEXIS 57670, *22-23 (W.D. Pa. 2010) (rejecting the inmate's claim that the supervisory defendants were liable based upon their failure to investigate his allegations of excessive force and their failure to properly train correctional officers in the proper use of force).

In the instant action, Plaintiff has not alleged that Defendant Lawler, Morrison, Harris, or Harman directly participated in the events of June 28, 2008, as they were not part of the cell extraction team or involved with Plaintiff's medical care.  Further, there is no evidence that they directed others to violate Plaintiff's rights or had contemporaneous knowledge of the events that took place that evening.  See Wesley v. Hollis, 2004 U.S. Dist. LEXIS 7596, *14-15 (E.D. Pa.

23

2004) (concluding that the plaintiff failed to plead a civil rights action against the prison security

lieutenant for failing to adequately investigate because there were no allegations that he had

knowledge of and/or acquiesced in the alleged wrongful conduct). Other than bare assertions,

Plaintiff has also failed to show that the supervisory defendants conspired in the alleged attack or

cover-up. See Lincoln v. Hanshaw, 375 Fed. Appx. 185, 190 (3d Cir. 2010) (holding, at

summary judgment, that the plaintiffs must provide some evidence of a conspiracy and "are not

entitled to an inference that their bare allegations create an issue of material fact for trial").

Finally, there is no evidence of a pattern of similar violations. Accordingly, Plaintiff's

allegations that the prison supervisors failed to adequately supervise, train, investigate, or

respond to his complaints fail to state a claim.

Additionally, Plaintiff's claim that Defendants Morrison, Harris, and Harman are liable

for erasing videotape evidence of the alleged assault because they had control of the security

office is based solely on the doctrine of respondeat superior. Plaintiff has not established direct

participation by, actual knowledge of, or acquiescence by, any of these Defendants in the alleged

destruction. The personal involvement of each supervisory defendant must be established;

therefore, Plaintiff's claim that at least one of the three must have allowed the tapes to be erased

is insufficient to impute liability. Further, there is no evidence that video of the observation cell

was deliberately destroyed.[11]

_____

[11]Defendant Morrison declared that on July 31, 2008, he was asked to collect various
videotapes from June 28, 2008 and June 29, 2008, but was unable to locate the later video until
sometime after August 26, 2008 when a second request was made. (Doc. 218, Exhibit 1). At
that time, he discovered that only a few hours out of twenty-five (25) hours of video taken by the
stationary camera in the observation cell on June 29, 2008 had been preserved. (Id.). Defendant
Morrison stated that the "rest were recycled in the normal course of operations within a few days
of the events." (Id.). As to the handheld video, it has already been determined that Defendant

Plaintiff has also failed to show that Defendants Morrison, Harris, Harman, and/or Lawler were personally involved with the alleged falsification of medical records.[12]  Although Plaintiff disputes the medical reports, he has not shown that the supervisors directed the medical staff to enter false information or that the supervisors knew of and acquiesced in the misrepresentations.

Further, there is no evidence that Defendants Morrison, Harris, Harman, and/or Lawler directed the medical staff not to photograph Plaintiff's injuries, allegedly in violation of BOP policy,[13] that they knew of and acquiesced in the omission, or that there was an obvious need for training in this respect.  Moreover, Plaintiff does not challenge the constitutionality of any prison policies; rather, he claims that Defendants violated such policies.  See (Doc. 342, p. 4) (alleging that Defendants ignored DC-ADM 001 which mandated photographs be taken of Plaintiff's injuries); (Doc. 333, pp. 3, 5) (claiming that Defendants disregarded DOC policies 13.2.1 and 13.8.1 regarding access to health care, and failed to preserve videotapes in accordance with DOC policies 6.3.1 and 6.5.1).  However, the violation of prison procedures does not constitute a

---

Goodman was assigned as videographer for the cell extraction team and there is evidence that he alone may have selectively edited the video.  See (Doc. 322) (Memorandum & Order adopting the R&R and denying Defendants Goodman and Snyder motion for summary judgment).

[12]Nurse Hallie Ritchey wrote in Plaintiff's medical reports, "I arrived at inmates cell, inmate had sheet tied around neck and tied to bedrail.  Officers removed sheet at this time.  Inmate was resisting...." (Doc. 228, p. 145, Ex. 4); see also (Doc. 333-1, p. 34, Ex. C) (Ritchey's written statement to Lieutenant Morris made a similar claim).  However, when interviewed by OPR, Ritchey stated that "she did not see Victor hanging or with a noose around his neck. ... Ritchey admitted she had falsified these reports.  Ritchey stated she had written down in her reports what she had heard some of the officers say." (Doc. 333-1, p. 33, Ex. C).  Ritchey claimed the conflicting statements were made in error.  (Id. at p. 34).

[13]Administrative policy DC-ADM 001 states that "[a]ny physical injuries that are reported by the inmate ... pursuant to a claim of abuse ... shall be immediately photographed by medical personnel and attached to the copy of the DC-457, Medical Incident/Injury Report submitted to the Shift Commander." (Doc. 241, p. 103).

"policy" and the failure to act in accordance therewith must have occurred consistently to be deemed a "custom." <u>Keohane v. Lancaster County</u>, 2010 U.S. Dist. LEXIS 85714, *41 (E.D. Pa. 2010). Petitioner has not alleged an ongoing failure to act. Furthermore, "even if these practices constituted 'custom,' Plaintiff[] must also establish that the practice was so widespread that the policy making officials had either actual or constructive notice, and acquiesced in the custom." <u>Id.</u>, <u>citing</u> <u>Berg v. Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000) ("Customs are 'practices of state officials . . . so permanent and well settled as to virtually constitute law.'"). Here, Plaintiff has not alleged that DOC policies were consistently disregarded or that such practices were so widespread to impute notice.

After <u>de novo</u> review, this Court agrees with Magistrate Judge Carlson that Plaintiff failed to allege personal involvement by Defendants Lawler, Morrison, Harris, and/or Harman. Consequently, summary judgment will be granted in favor of these supervisory defendants and the claims against them will be dismissed.

### C.   Claims against Defendants Cooper,[14] Moore, and Miller

The R&R identified Plaintiff's claims against Defendants Cooper, Moore, and Miller: that they saw Plaintiff in the infirmary, but failed to provide medical care for his pain and broken jaw, and, also, that they falsified medical reports. (Doc. 331, p. 7). Defendant Lieutenant Cooper was the shift supervisor on June 28, 2008, Defendant Moore was employed as a registered nurse ("RN"), and Defendant Miller was working as a Licensed Practical Nurse ("LPN"). (Doc. 228, pp. 142, 154, 166). The Magistrate Judge found that these Defendants

---

[14]Although the claim against Defendant Cooper is in his supervisory role, <u>see</u> (doc. 333, pp. 4, 10), Plaintiff did allege his personal involvement in the June 28, 2008 incident.

"deny Victor's claims, while acknowledging that they had contact with Victor, who they described as injured, bleeding, and agitated, at the infirmary on the evening of June 28, 2008." (Id.), citing (Doc. 227, ¶¶ 33-54). The Report stated that "[w]hile these facts may be disputed, what is undisputed is the fact that Victor never fully exhausted administrative remedies with respect to these Correctional Defendants" and; therefore, the R&R did not address the merits of the claims. (Id.), citing (Doc. 227, ¶¶ 21-31) and (Doc. 242. ¶¶21-31). However, having determined that grievance no. 235059 named, inter alia, Defendants Cooper, Moore, and Miller, this Court will address the merits of Plaintiff's claims.

The Amended Complaint averred that following the alleged assault, Plaintiff was obviously injured, but Defendants Cooper, Moore, and Miller failed to provide any medical treatment in an effort to cover up the attack. (Doc. 16, p. 5); see also (Doc. 333, pp. 2-4, 7). Plaintiff claimed that he suffered severe pain[15] as a result of the deliberate indifference to his medical needs by these Defendants. (Doc. 16, pp. 5-7). In his deposition, Plaintiff stated that while in the observation cell, Defendant Cooper approached his door, laughing, and told him "you're not getting no hospital treatment, you're not getting no stitches, no pain meds or anything. We're not doing nothing for you." (Doc. 228, p. 32); see also (Doc. 333, p. 4) (claiming that Defendant Cooper went to Plaintiff in the observation cell "as the shift commander that night 6/28/08 which is the highest authority position that night and he told [Plaintiff] with malice that [Plaintiff] was not getting any medical treatment, no ice, no pain meds, no exam, and no hospital treatment...."). Plaintiff testified that Defendant Moore, who was aware of his

---

[15]It is undisputed that Plaintiff was eventually taken to Altoona Hospital, where he underwent surgery to repair a broken jaw. See (Doc. 1, p. 11); (Doc. 228, Ex. 4, p. 152).

injuries, told Plaintiff to stop asking for medical treatment because he was not going to receive any. (Doc. 228, p. 27). He alleged that Defendant Moore told him to spit out blood in the toilet, not on the floor, to cover up her obvious failure to provide medical attention. (Id. at pp. 27-29). Plaintiff stated that he told Defendant Miller his jaw was broken and that although she saw his mouth was bleeding and the injuries to his head, leg, and hand, she did not provide any medical treatment. (Id. at pp. 25-26). Additionally, Plaintiff asserted that he was in a suicide observation cell for more than ten (10) hours, bleeding from his head and mouth, but only the first three (3) hours of videotape evidence were preserved. (Id. at pp. 27-29); (Doc. 333, pp. 2-4, 10). He alleged that Defendants Cooper, Moore, and Miller falsified his medical records. (Doc. 16, p. 5). In his objections to the R&R, Plaintiff also claims that they knew BOP policy required that photographs be taken of his injuries, but they were not. (Doc. 342, p. 10).

The moving defendants suggest that the only mention of Defendant Cooper in grievance no. 235059 is for allegedly laughing at Plaintiff in the observation cell, which they assert is insufficient notice of a deliberate indifference claim. (Doc. 341, p. 13). Further, they contend that Defendant Cooper lacks medical training and was unaware that Plaintiff suffered from a broken jaw. (Id.). The moving defendants argue that Defendant Moore was unaware that Plaintiff's jaw was broken, that she believed the source of Plaintiff's mouth bleed was his molar tooth, that the medical records confirm her attentiveness to his care, and that the on-call doctor did not order medical treatment until Plaintiff could be evaluated the following morning. (Id. at pp. 11-12). They assert that Defendant Miller only saw Plaintiff for a few minutes, that she was unaware of his broken jaw, that Plaintiff refused to come to the cell window, and that he did not speak or open his mouth. (Id. at p. 12). The moving defendants contend that "'an inadvertent

failure to provide adequate medical care' does not constitute deliberate indifference." (Id.),
citing Estelle v. Gamble, 429 U.S. 97, 105 (1976); Zerbe v. Karnes, 2008 U.S. Dist. LEXIS 5551
(M.D. Pa. 2008) (Jones, J.).

First, grievance no. 235059 alleged that several officers took Plaintiff to suicide
observation where he "was denied medical attention, photos & laughed at by Lt. Cooper...."
(Doc. 228, p. 69). The grievance also asserted that Plaintiff "bled all night in [observation] &
laughed at." (Id.). Upon review, this Court determines that regardless of where Defendant
Cooper's name appeared in the sentence, he was put on notice of a claim of deliberate
indifference against him. Further, Defendant Cooper's lack of medical training is not
determinative because Plaintiff alleges that his medical condition was so obvious that a lay
person would recognize the necessity of treatment. See (Doc. 333, p. 10) (citing Colburn v.
Upper Darby Township, 946 F.2d 1017, 1023 (3d Cir. 1991)). It is undisputed that on June 28,
2008, Defendant Cooper was responsible for seeing that BOP policies and procedures were
followed, that he was assigned to the infirmary zone, that he spoke with Plaintiff regarding the
alleged assault, that he saw Plaintiff spitting out blood hours after the incident, and that Plaintiff
requested medical treatment and photographs of his injuries. (Doc. 228, p. 167, Ex. 6); (Doc.
333, pp. 2-4, 10). Although Defendant Cooper asserts that he observed only a small cut in
Plaintiff's mouth and conferred with Defendant Moore about Plaintiff's medical care, (Doc. 333-
1, p. 38, Ex. C), Plaintiff claims that Defendant Cooper approached him "with malice" and
advised Plaintiff that he was not going to get "any medical treatment, no ice, no pain meds, no
exam, and no hospital treatment," (Doc. 333, p. 4); see also (Doc. 228, p. 32). Accordingly,
Plaintiff has alleged Defendant Cooper's personal involvement, see Zimmerman, 654 F. Supp. 2d

29

at 253, and genuine issues of material fact exist to preclude an award of summary judgment.

Second, the medical records do not "confirm" the moving defendants' claim that Plaintiff was afforded adequate medical care. Rather, a reasonable jury could find that Plaintiff was not provided with any medical treatment at all. See United States ex rel. Walker v. Fayette County, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (Although the courts are reluctant to second guess medical judgments, they "distinguish between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.").

The first "Progress Note" in Plaintiff's medical records from June 28, 2008 was written by Nurse Ritchey at 1955 hours. (Doc. 228, Ex. 4). She reported that she saw Plaintiff attempting to hang himself and then resist the efforts of corrections officers to free him and move him to another cell. (Id.). However, as previously mentioned, Nurse Ritchey admitted that her entry pertaining to the cause of Plaintiff's injuries was based on statements she heard other officers make and that she did not actually see how Plaintiff sustained his injuries. See Footnote 14 herein. Her medical notes also indicated that when Plaintiff was asked about his injuries, he would not talk, but pointed to his jaw and knee. (Doc. 228, Ex. 4). Nurse Ritchey reported that Plaintiff's jaw was symmetrical, his knee was swollen, he had minimal amounts of blood on different areas of his face, and that his mouth was bleeding. (Id.). The records stated that Plaintiff was to be transferred to an observation cell for further assessment.[16] (Id.).

The next three entries in Plaintiff's medical records were made by Nurse Albright. At 2045 hours and 2055 hours, she noted that Plaintiff was placed in an observation cell, but would

---

[16]Notably, Nurse Ritchey later admitted that Plaintiff should have been given medical care and she was disciplined for her failure to properly assess and render medical attention. See (Doc. 333-1, Ex. C, pp. 33-34, 43-45).

not come to the window for an assessment. (Doc. 228, Ex. 4). She reported that Plaintiff refused to open his mouth or talk, but attempted to use gestures to communicate. (Id.). Nurse Albright contacted the on-call doctor, Dr. Reis, who directed her to call Dr. Klemick. (Id.). She advised Dr. Klemick that the Restrictive Housing Unit Lieutenant said Plaintiff had been screaming obscenities, but Plaintiff was refusing to talk or open his mouth for medical personnel. (Id.). At 2110 hours, Nurse Albright noted that Plaintiff was pacing in his cell and pounding on the window, but still would not speak. (Id.).

At 2130 hours, Defendant Miller reported that an observation officer informed her that Plaintiff moved his mouth and spit out blood. (Doc. 228, Ex. 4). She went to see Plaintiff, but he refused to open his mouth. (Id.). Plaintiff made hand gestures, but Defendant Miller reported that it was unclear what he was trying to do. (Id.). At 2150 hours, Defendant Miller noted that Plaintiff continued to pace in his cell and refused to open his mouth for an evaluation. (Id.).

An entry was made in Plaintiff's medical records at 2300 hours, but the author's name is illegible. (Doc. 228, Ex. 4). It states that Plaintiff refused to speak and would only point to his jaw and knee. (Id.). The writer reports that a possible broken molar tooth was observed. (Id.).

Defendant Moore wrote the next several notes beginning at 2315 hours. (Doc. 228, Ex. 4). She reported that Plaintiff pounded on the cell door, refused to speak, and pointed to his left jaw, right knee, and left hand. (Id.). Defendant Moore noted that Plaintiff's mouth was bleeding and that he had a small cut around his molar tooth. (Id.). The medical records stated that areas of the floor were bloody, but that the bleeding was minimal and Plaintiff was allowing the blood to mix in with saliva before spitting it out. (Id.). Defendant Moore contacted Defendant Cooper, at which time Plaintiff reportedly spoke. (Id.). The notes indicated that they explained to

31

Plaintiff that he should lay down and allow the blood to clot. (Id.). At 0010 hours on June 29, 2008, Defendant Moore noted that Plaintiff was sitting on the bed making gestures and talking to himself, which she reported as "ineffective coping." (Id.). At 0200 hours, Defendant Moore wrote in the Progress Notes that Plaintiff was pacing in the cell, occasionally hitting the door, and continuing to spit out blood and saliva. (Id.). Her assessment was again "ineffective coping." (Id.). At 0400 hours, Defendant Moore reported that Plaintiff pounded on the cell door and requested ice for his jaw pain. (Id.). Defendant Moore informed Plaintiff she could not give him ice without a doctor's order. (Id.). At 0500 hours, Defendant Moore again assessed Plaintiff, who was reportedly standing on the bed staring at the wall, with "ineffective coping." (Id.).

At 0555 hours, Dr. Klemick noted that Plaintiff should be set up for a team assessment. (Doc. 228, Ex. 4). At 0715 hours, Dr. Klemick reported that Plaintiff was unable to speak clearly due to jaw pain and had blood and saliva in his mouth. (Id.). The doctor noted multiple contusions to Plaintiff's cheek, chest, head, ribs, shoulder, and knee. (Id.). Dr. Klemick diagnosed a probable left jaw, mid-mandible fracture and sent Plaintiff to Altoona Hospital for further evaluation. (Id.).

Contrary to the moving defendants' argument, these medical records do not show that Defendant Moore was "attentive to the Plaintiff's needs." See (Doc. 341, p. 12). Further, whether or not Defendant Miller "only saw the plaintiff for a few minutes that night" does not excuse her failure to provide medical treatment. (Id.). Considering all the evidence, it is determined that a jury could reasonably find that Defendants Moore and Miller failed to give Plaintiff any medical treatment and were deliberately indifferent to his medical needs.

Defendant Miller's shift ended at 2200 hours, but she made her first entry in Plaintiff's

32

progress notes at 2130 hours. (Id.); (Doc. 228, Ex. 4). The records establish that she was informed that Plaintiff spit out blood and that she looked in on him at least twice before her shift ended. (Doc. 228, Ex. 4). According to the medical reports, Plaintiff refused to open his mouth for an evaluation, but he tried to communicate with gestures. (Id.). Although Defendant Miller may not have understood his gestures, a jury could find that her failure to investigate the source of the bleed and the reason Plaintiff would not talk despite his attempt to communicate was deliberately indifferent to Plaintiff's medical needs. Additionally, in summary judgment proceedings the non-movant's evidence should be taken as true and Plaintiff testified that he told Defendant Miller his jaw was broken yet she failed to provide any medical treatment. (Doc. 228, pp. 25-26). Consequently, summary judgment will be denied as to Defendant Miller.

Defendant Moore was arguably responsible for Plaintiff's care beginning at 2315 hours when she made her first progress note in Plaintiff's medical records. See (Doc. 228, Ex. 4). A jury could reasonably find that over the next six (6) hours, Defendant Moore did nothing more than note Plaintiff's behavior and refuse to provide medical treatment. She reported in Plaintiff's medical records that he pointed to his knee, which was swollen, and to his jaw, which was cut around his molar tooth and bleeding. (Id.). Although she initially advised Plaintiff that if he laid down the blood would clot, he continued to spit out blood for several hours. (Id.). The medical records show that Defendant Moore made no further evaluation of Plaintiff's jaw and made no attempts to stop the bleeding; rather, she noted "ineffective coping." (Id.). When Plaintiff requested ice for his jaw pain, approximately seven (7) hours after the on-call doctor was contacted, Defendant Moore refused to give Plaintiff ice and failed to phone the on-call doctor to update him on Plaintiff's condition. (Id.). Although this Court recognizes that a nurse may not

33

be allowed to order prescription medication without a doctor's order, it is hard to believe that a nurse could not provide ice to an inmate in pain without a doctor's approval. Compare Everett v. Donate, 2010 U.S. Dist. LEXIS 26870, *17-19 (M.D. Pa. 2010) (Vanaskie, J.) (granting summary judgment to a prison nurse who failed to order diagnostic testing on an inmate complaining of knee pain and a chipped tooth because the RN did prescribe ice and a non-prescription pain medication). Further, in light of Plaintiff's continued pain and bleeding, the moving defendants cannot rely on the on-call doctor's initial assessment and treatment recommendation to excuse Defendant Moore's failure to provide any medical care for the hours he was under her supervision. Therefore, a jury could reasonably find that Defendant Moore was deliberately indifferent to Plaintiff's medical needs.

The cases Defendants Miller and Moore cite in support of their conduct are distinguishable from the instant action. See (Doc. 341, pp. 12-13), citing Wilson v. Cartwright, 557 F. Supp. 2d 482 (D. Del. 2008); Lindsay v. Dunleavy, 177 F. Supp. 2d 398 (E.D. Pa. 2001); Zerbe, 2008 U.S. Dist. LEXIS 5551. Unlike the medical staff in the cited cases, Plaintiff, here, was not given ice or pain medication.

In Wilson, a prison nurse attempted to splint the plaintiff's finger despite the fact that it was clearly broken. Wilson, 557 F. Supp. 2d at 483-84. The on-call doctor diagnosed a dislocated finger and advised her to give the plaintiff pain medication and have him return in thirty minutes, at which point the nurse would attempt to put the finger back into place. Id. Her attempt was unsuccessful and the doctor told her to try again in an additional thirty minutes after administering another pain pill. Id. Upon the plaintiff's return, the nurse decided not to touch his finger and he was taken to the hospital. Id. The Court concluded that the section 1983 claim

34

did not rise to a constitutional level because the plaintiff was never denied medical treatment and the delay in transporting him to the hospital "occurred in the course of treating plaintiff based on the initial diagnosis and was not caused by a non-medical reason." Id.

The plaintiff in Lindsay was punched in the jaw by another inmate and taken to prison's medical facility for treatment. Lindsay, 177 F. Supp. 2d at 400-01. A physician's assistant ("PA") examined the plaintiff's mouth and gave him pain medication and cotton to bite on to stop the bleeding. Id. The plaintiff repeated his complaints for a week; but, the PA explained that his jaw needed time to heal and that if it were broken, the plaintiff would have been unable to talk. Id. A week later, the plaintiff was transferred to another correctional facility, at which the medical department x-rayed his jaw and found that his jaw was broken. Id. The Court held that "[a]bsent allegations that [the PA] possessed the requisite intent to establish deliberate indifference, Plaintiff has not properly pled a § 1983 action against [him]." Id. at 403.

In Zerbe, the plaintiff reported jaw and tooth pain after an assault by another prisoner. Zerbe, 2008 U.S. Dist. LEXIS 5551 at *8-9. A nurse evaluated the injury, observed a swollen jaw, and provided medication and ice to treat his pain. Id. When the plaintiff returned the next day complaining of jaw pain, swelling, and difficulty chewing, the medical staff determined that his jaw was not dislocated and again dispensed pain medication. Id. Three days later, the plaintiff returned in pain and was given medication. Id. It was not until six (6) days after he sustained the injury and first reported to the medical staff that the plaintiff was taken to a hospital for x-rays and diagnosed with a broken jaw. Id. The Zerbe court concluded that the nurse's "decisions not to order an x-ray or to seek an immediate consult with a physician, and her failure to diagnose Plaintiff's broken jaw, are all the result of her medical judgment as to the

35

appropriateness thereof" and did not amount to a constitutional violation. Id. at *22.

In the instant action, a jury could reasonably find that Defendants Cooper, Miller, and Moore made no effort to stop Plaintiff's bleeding or to ease his pain. Additionally, there are genuine issues of material fact as to whether these Defendants possessed the requisite intent for a deliberate indifference claim. See (Doc. 228, pp. 27, 32) (Plaintiff testified that Defendant Moore had a grin on her face and Defendant Cooper was laughing when they told Plaintiff he was not going to receive any medical treatment.); Freeman v. Dep't of Corr., 2009 U.S. Dist. LEXIS 84926, *9-11 (M.D. Pa. 2009) (Vanaskie, J.) (denying a motion to dismiss an inmate's claim of deliberate indifference because he alleged that the nurse-defendant failed to provide ice, pain medication, and bandages for visible injuries solely because he was housed in segregation). A jury could reasonably find that Defendants Cooper, Moore, and Miller attempted to cover-up the use of excessive force by failing to follow BOP policy that required the medical staff to photograph Plaintiff's injuries. DC-ADM 001 states:

> [a]ny physical injuries that are reported by the inmate or otherwise observable by medical personnel pursuant to a claim of abuse or a suspicion of abuse shall be immediately photographed by medical personnel and attached to the copy of the DC-457, Medical Incident/Injury Report submitted to the Shift Commander.

(Doc. 241, p. 103). The policy specifies that "[a]t least four complete sets of viable color photographs, (the number of photographs necessary to depict all the injuries) shall be prepared by medical personnel to depict each identified injury...." (Id.). Here, there is no evidence that the medical staff abided by this policy. Further, Defendant Cooper, who supervised the infirmary on June 28, 2008, and was responsible for assuring that BOP policies and procedures were followed, was notified by Plaintiff that photographs were not taken by medical staff and failed to follow-

36

up. See (Doc. 333, pp. 2-4, 10). A jury could reasonably conclude that Defendants intentionally ignored policy to cover-up evidence of an assault.

In Williams, the plaintiff was assaulted by fellow inmates and was taken to the infirmary for medical treatment. Williams v. Klem, 2008 U.S. Dist. LEXIS 76814, *21-22 (M.D. Pa. 2008) (Vanaskie, J.) He claimed that the nurse "failed to treat him or take photographs to document his injuries." Id. The Court held that the plaintiff had "alleged sufficient facts to show that [the nurse] was deliberately indifferent to his medical needs when she ignored his requests for medical treatment and he received no medical treatment for his injuries. Id.

Similarly, in Brathwaite, the Court denied the defendants' motion for summary judgment, finding that "[t]here remain genuine issues of material fact as to whether the force at issue was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Brathwaite v. Rispoli, 2008 U.S. Dist. LEXIS 12561, *12-15 (D. Del. 2008). Therein, the plaintiff argued that prison officers' use of excessive force caused numerous injuries and his repeated requests to have photographs taken were ignored. Id. The Court concluded that the parties' version of the encounter differed and, further, that the plaintiff's medical reports reflected that he sustained multiple injuries in the altercation but it was only upon his insistence that details of his injuries were placed in his medical records. Id.

Based on the foregoing, the motion for summary judgment will be denied as to the claims against Defendants Cooper, Miller, and Moore.

**D.    Busco**[17]

Assuming arguendo that the Amended Complaint stated a claim against Defendant

---

[17]The R&R failed to discuss Defendant Busco.

Busco, in his supervisory role, for allowing the defendants to deprive Plaintiff of food, yard time, and showers, Plaintiff failed to exhaust remedies with respect to this claim and it will be dismissed. See (Doc. 228, pp. 33-34, 57, Plaintiff's deposition) (testifying that Defendant Busco "allowed the harassment and abuse and the retaliation to continue to escalate"). However, the Amended Complaint also alleged that Defendant Busco conspired in the attack on June 28, 2008, and failed to stop it. (Doc. 16, p. 5). As previously discussed, Plaintiff has shown why it was not practicable for him to name Defendant Busco in grievance no. 235059; therefore, the merits of this claim will be examined.

The Amended Complaint alleged that the defendants fabricated a story that Plaintiff was attempting suicide when the extraction team arrived at his cell on June 28, 2008, and planted a noose to aid in covering up the subsequent attack. (Doc. 16, p. 5). In his objections to the R&R, Plaintiff alleges that Defendant Busco knew he did not have a noose, but let the officers into his cell on the false order that he was "hanging up." (Id.); (Doc. 342, p. 2). Specifically, Plaintiff claims that Defendant Busco "was staring right at [him] up until the second they arrived" and saw he did not have a sheet. (Doc. 342, p. 2). He claims that Defendant Busco watched Snyder create a noose at Diffin's signal to plant in his cell. (Doc. 342, p. 2). Further, the Amended Complaint alleged that Defendant Busco failed to stop the assault due to his participation in its planning and execution. (Doc. 16, p. 5). In his objections, Plaintiff states that Defendant Busco "had a clear view into [Plaintiff's] cell from his station" and "watched his officers beating [Plaintiff] and did not take any steps to stop it, report it and instead [lied during the OPR investigation]." (Doc. 333, p. 2).

The moving defendants assert that there is no evidence that Defendant Busco was part of

38

the alleged conspiracy to attack Plaintiff or of its cover-up. (Doc. 341, p. 7). They argue that although Plaintiff refers to Defendant Busco's interview to support liability, the statement does not implicate him. (Id.).

In his OPR interview, Defendant Busco stated that he was working in the control room on June 28, 2008. (Doc. 259, pp. 20-22). He reported that Plaintiff refused to obey an order to move and a cell extraction had been authorized. (Id.). Defendant Busco stated that he did not have any conversations with Diffin, who was in charge of the cell extraction team, or any other members of the extraction team. (Id.). Defendant Busco averred that the extraction team walked at a normal pace with no visible sign of urgency until they arrived at the cell and Diffin announced that Plaintiff was hanging up and to open the door. (Id.). A few minutes after the cell extraction team entered Plaintiff's cell, Diffin reportedly handed out to Snyder a sheet tied into noose. (Id.). Defendant Busco explained that Snyder brought the sheet to the control room. (Id.). He stated that he had not seen any sheets prior to the team's arrival at Plaintiff's cell. (Id.). Defendant Busco "said being that he was in the control room he did not hear any inmates yelling anything out about Snyder having a sheet." (Id.).

The Third Circuit Court of Appeals holds "that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002). A plaintiff must show that (1) a constitutional violation took place in the officer's presence, and (2) the officer had "a realistic and reasonable opportunity to intervene." Id. at 650-51. In reversing an award of summary judgment, the Smith court determined, in that case, "[t]here is some evidence that [the defendant] witnessed the

39

beating that his fellow officers allegedly administered to [the plaintiff]." Id. Specifically, in the

defendant's misconduct report, he stated that "the minimum amount of force was used to place

inmate Smith onto the floor." Id. The Court concluded:

> This appears to be based upon first-hand observations [the defendant] made while
> standing at the door of the Unit Manager's office during the incident. [The
> plaintiff] further testified that the door of the office remained open throughout the
> incident and that [the defendant] saw the beating. A fact finder could conclude
> that [the defendant] knew that his fellow officers were using excessive force
> against [the plaintiff], had an opportunity to intervene, but refused to do so.

Id. The Court explained that the law does not allow a corrections officer to "condone or cover up

the use of excessive force" and that an officer cannot "escape liability by turning either a blind

eye or deaf ear to the illegal conduct of [his] colleagues." Id. at 652.

In Williams, the plaintiff alleged that the defendants, corrections officers, "knew about

the fight with his cell mate because they were 'up front'"; but, the plaintiff conceded that he

based this belief on the fact that he saw each of them working in the SHU on the day of the

incident and because another officer told him they were aware. Williams v. Holtzapple, 2010

U.S. Dist. LEXIS 30710, 817-19 (M.D. Pa. 2010) (Munley, J.). The record demonstrated that the

defendants had various duties requiring them to move throughout the SHU on the day of the

incident. Id. The Court concluded that the plaintiff's allegations relied on "unsupported

assertions, conclusory allegations and mere suspicions, which are insufficient to establish

personal involvement" and awarded the defendants summary judgment. Id.; see also Williams v.

Lane, 2007 U.S. Dist. LEXIS 16938, *9-10 (E.D. Pa. 2007) (concluding that although a court

should liberally construe a pro se litigant's submissions, the same standards for summary

judgment still apply). The Court explained that "the nonmoving party must 'go beyond the

40

pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" Id.; see also Williams v. Beard, 2011 U.S. Dist. LEXIS 34310, *9 (M.D. Pa. 2011) (Jones, J.) (holding that although "[s]ummary judgment should not be granted when there is a disagreement about the facts..., 'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'") (internal citations omitted).

In the instant action, Plaintiff failed to present any evidence that Defendant Busco conspired in the attack or cover-up on June 28, 2008. The Amended Complaint alleged that Defendant Busco knew Plaintiff did not have a noose when he let the extraction team into Plaintiff's cell on the false order that Plaintiff was attempting suicide. (Doc. 16, p. 5). However, Plaintiff concedes that he was scheduled to be moved. (Doc. 259, p. 7). Accordingly, Defendant Busco would have let the cell extraction team into Plaintiff's cell regardless of Diffin's statement that Plaintiff was hanging up.

Additionally, Plaintiff has not established that Defendant Busco was aware of the alleged assault and knowingly refused to intervene. Defendant Busco was in the control room at the time of the incident, which was out of earshot of the inmates' cells. See (Doc. 259, pp. 20-22). Although Plaintiff alleges in his objections to the R&R that Defendant Busco had a clear view into his cell, "watched his officers beating [him,] and did not take any steps to stop it," Plaintiff also argues that he was unable to name Defendant Busco in a grievance because he did not know who opened his cell door until reading the OPR investigation reports. (Doc. 333, pp. 2, 9). These allegations are inconsistent. If Plaintiff saw Defendant Busco watch the assault and fail to

41

intervene, then his participation was known at the time the grievance was filed and Plaintiff

should have identified him in grievance no. 235059. Even if Plaintiff did not know his name, the

grievance could have referred to a corrections officer in the control room who failed to stop the

abuse. See (Doc. 228, pp. 68-69) (Plaintiff did not know the identity of all the medical staff, but

referred to a "bald nurse" and an "older white nurse" in his grievance.). Consequently, the claims

against Defendant Busco would be dismissed for Plaintiff's failure to exhaust administrative

remedies.

If, however, this Court accepts that it was not practicable for Plaintiff to name Defendant

Busco in a grievance because he was unaware of Defendant Busco's involvement until he read

the OPR investigative report, then Plaintiff's allegations that Defendant Busco witnessed the

attack and failed to stop it are mere suspicions and cannot defeat the summary judgment motion.

See Williams, 2010 U.S. Dist. LEXIS 30710 at *817-19. Defendant Busco's act of opening

Plaintiff's cell door, alone, does not establish that he was aware an assault was occurring inside

Plaintiff's cell. According to Lehman, who was part of the extraction team and therefore closer

than Defendant Busco, he could not see Plaintiff through the cell door because his view was

blocked by the officer in front of him. (Doc. 259, p. 67). Further, the statements taken from

inmates who witnessed the alleged assault failed to mention Defendant Busco. See (Doc. 241,

pp. 228-36). Therefore, Plaintiff has not shown through affidavits, depositions,[18] answers to

interrogatories, or admissions on file, that Defendant Busco, who remained in the control room,

was aware of the alleged assault and had "a realistic and reasonable opportunity to intervene."

---

[18]Plaintiff's deposition only mentions Defendant Busco in relation to the unexhausted
allegations that Plaintiff was deprived of food, yard, and showers. (Doc. 241, pp. 33-35, 57).

Summary judgment will be awarded in favor of Defendant Busco.

### E.     Objections regarding Magistrate Judge

Plaintiff objects to the R&R based on Magistrate Judge Carlson's refusal to recuse

himself from these proceedings.  (Do. 333, pp. 8-9).  Plaintiff alleges that he contacted

Magistrate Judge Carlson when he was the United States Attorney[19] about prosecuting this case

criminally and was refused.  (Id.).  He claims that the DOC Defendants were given special

treatment.  (Id.).  Plaintiff alleges that the R&R "is filled with hostility and a clear prejudice

towards Plaintiff and seeks to retaliate via revenge for [Plaintiff] seeking his recusal."  (Id.).

Further, Plaintiff contends that Magistrate Judge Carlson unfairly applied the standards and

decided the case instead of sending it to a jury.  (Id.).

On February 1, 2011, Plaintiff filed a motion seeking recusal of Magistrate Judge

Carlson.  (Docs. 319-320).  He argued that the Magistrate Judge had a conflict because at the

time Plaintiff had requested that the United States Attorney's Office in the Middle District of

Pennsylvania pursue criminal charges for the alleged assault, Magistrate Judge Carlson was

serving as the United States Attorney.  (Id.).  Plaintiff pointed out that multiple motions for

summary judgment had been decided, but complained about the speed in which the DOC's

motion for summary judgment was answered.  (Id.).  He alleged that the DOC was being given

special treatment and sought Magistrate Judge Carlson's recusal "on grounds of collusion."  (Id.).

On February 18, 2011, Magistrate Judge Carlson issued a Memorandum and Order

denying Plaintiff's motion for recusal.  (Doc. 323).  The Memorandum identified the

---

[19]It is noted that this case was originally referred to Magistrate Judge J. Andrew Smyser, but was transferred to Magistrate Judge Carlson on August 24, 2009.  (Doc. 133).

disqualification standards, explained that "a party's disappointment with what the party anticipates may be the court's rulings cannot form the basis for recusal," and stated that Plaintiff's motion was procedurally flawed for failing to include an affidavit regarding personal bias. (Id. at pp. 3-4, 6-8) (citing Conklin v. Warrington Township, 476 F. Supp. 2d 458 (M.D. Pa. 2007) (Conner, J.). Magistrate Judge Carlson determined that a recusal motion must be raised at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim, but that Plaintiff waited sixteen (16) months to file his motion. (Id. at pp. 5, 8). Nevertheless, Magistrate Judge Carlson considered the merits of Plaintiff's request. He concluded that a judge's prior government service, alone, does not provide grounds for recusal. (Id. at pp. 5-6) (citing Edelstein v. Wilentz, 812 F.2d 128, 131 (3d Cir. 1987)). Finally, Magistrate Judge Carlson determined that he was not personally involved with Plaintiff's alleged complaint while he was in the United States Attorney's Office and that there was no basis to grant the motion. (Id. at pp. 8-9).

Recusal is required whenever a judge's "impartiality might reasonably be questioned" or the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding..." 28 U.S.C. § 455(a), (b)(1); see also 28 U.S.C. § 144. The "purpose of recusal is to ensure justice to litigants in pending litigation and to promote public confidence in the judiciary." Breslin v. Dickinson Twp., 2010 U.S. Dist. LEXIS 23625, *5 (M.D. Pa. 2010) (Kane, J.); see also Veteto v. Miller, 829 F. Supp. 1486, 1491 n.4 (M.D. Pa. 1992) (Conaboy, J.) (holding that "recusal is only appropriate when it appears a judge has 'bias generated from a source outside the context of the judicial proceeding'" and refusing to address the plaintiff's baseless allegations).

44

Considering the number of Defendants and claims in this action, the countless documents filed by Plaintiff, and the multiple motions raised by Defendants, this Court does not believe that there has been unnecessary delay in decisions being rendered or that the DOC has received special treatment. Although this Court has reached a different decision on some of the issues upon de novo review, Plaintiff's broad claim that the R&R "is filled with hostility and a clear prejudice" is wholly unsupported. Further, Plaintiff's allegations that Magistrate Judge Carlson has retaliatory motives and unfairly applied the standards of review is baseless. Plaintiff's objections in this regard will be denied.

## Conclusion

After de novo review, this Court concludes that grievance no. 235059, which was fully exhausted, identified Defendants Cooper, Morrison, Moore, Miller, and Lawler. Although the grievance did not name Defendants Busco, Harris, and Harman, Plaintiff has shown why it was not "practicable" for him to identify these Defendants. Accordingly, the R&R will not be adopted as to its exhaustion recommendations. It is also noted that the moving defendants failed to plead untimely exhaustion pursuant to DC-ADM 804 and dismissal on such grounds at this late stage of the proceedings would be prejudicial to Plaintiff. Regardless, it may be concluded that Plaintiff also exhausted administrative remedies pursuant to DC-ADM 001.

Next, Magistrate Judge Carlson's conclusion that Plaintiff failed to allege personal involvement by Defendants Lawler, Morrison, Harris, and/or Harman will be adopted. Summary judgment will be granted in favor of these supervisory defendants and the claims against them will be dismissed.

Regarding Defendants Cooper, Miller, and Moore, a jury could reasonably find that they

45

failed to provide any medical care and were deliberately indifferent to Plaintiff's medical needs. There are genuine issues of material fact as to whether these Defendants possessed the requisite intent and whether they attempted to cover-up the use of excessive force by ignoring BOP policy that required the medical staff to photograph Plaintiff's injuries. Accordingly, the motion for summary judgment will be denied as to the claims against Defendants Cooper, Miller, and Moore.

This Court determines that Plaintiff's claims regarding Defendant Busco are inconsistent. If Plaintiff saw Defendant Busco witness the attack and refuse to intervene, then he should have been identified in grievance no. 235059. Because he was not, the claims against Defendant Busco would be dismissed for failure to exhaust administrative remedies. On the other hand, if this Court accepts that it was not practicable for Plaintiff to name Defendant Busco in a grievance because he was unaware of Defendant Busco's involvement at the time the grievance was filed, then Plaintiff's allegations that Defendant Busco watched the attack are mere suspicions and cannot defeat the summary judgment motion. Either way, summary judgment will be granted in favor of Defendant Busco and the claims against him will be dismissed.

Finally, Plaintiff's objections regarding Magistrate Judge Carlson's decision not to recuse himself from this case will be overruled. Plaintiff's arguments in this regard are meritless.

**United States District Judge**

**Date:** August 12, 2011

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM VICTOR,          :
       Plaintiff        :
                        :     CIVIL NO. 3:08-1374
    v.                :
                        :     (JUDGE NEALON)
SCI SMITHFIELD, et al.,     :     (MAGISTRATE JUDGE CARLSON)
       Defendants    :

## ORDER

**NOW**, THIS 12th DAY OF AUGUST, 2011, **IT IS HEREBY ORDERED THAT:**

1.    The Report and Recommendation (Doc. 331) is **ADOPTED in part**;

2.    The motion for summary judgment (Doc. 225) is **DISMISSED as moot** as to Defendants Fisher, Corbin, Stevens, and Maul, see (Doc. 267);

3.    The motion for summary judgment (Doc. 225) is **GRANTED in part** as to Defendants Lalli, Butler, Garzarelli, Mitchell, Clapper, and Baird, summary judgment is awarded in favor of these Defendants, and they are **TERMINATED** as parties to this action;

4.    The motion for summary judgment (Doc. 225) is **GRANTED in part** as to supervisory Defendants Lawler, Morrison, Harris, and Harman, summary judgment is awarded in favor of these Defendants, and they are **TERMINATED** as parties to this action;

5.    The motion for summary judgment (Doc. 225) is **GRANTED in part** as to Defendant Busco, summary judgment is awarded in favor of Defendant Busco, and he is **TERMINATED** as a party to this action;

6.    The motion for summary judgment (Doc. 225) is **DENIED in part** as to Defendants Cooper, Miller, and Moore;

7.    Plaintiff's objections to the R&R are **OVERRULED in part** as explained in the accompanying Memorandum;

8.    This case is **REMANDED** to Magistrate Judge Carlson for further proceedings;

9.    Any appeal will be deemed frivolous, lacking merit, and not taken in good faith.

_____
**United States District Judge**