## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM VICTOR** | : | **Civil No. 3:08-CV-1374** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **R.M. LAWLER, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

This case is a prisoner civil rights lawsuit lodged by the Plaintiff, William Victor, against correctional staff at SCI Huntingdon.  In this lawsuit, Victor alleges that he was the victim of a staff assault at the prison in June of 2008.  During this cell extraction Victor suffered a broken jaw.

This matter now comes before us for consideration of a request by Victor that the Court impose spoliation sanctions on the Defendants.  Victor seeks these sanctions as a penalty for what he regards as a multi-faceted series of episodes of alleged spoliation involving the failure to retain and preserve physical evidence, as well as a failure to preserve prison videotapes which may have depicted aspects of

this incident in which Victor contends that excessive force was used against him in the course of a cell extraction at the prison.

These claims of spoliation were set, in part, against the backdrop of disciplinary proceedings conducted by prison officials in the wake of this use-of-force incident.   Indeed, many of Victor's claims derive from evidence developed by the Department of Corrections during its own internal inquiries.   Accordingly, in order to allow Victor every reasonable opportunity to factually develop these spoliation claims, we conducted a week-long evidentiary hearing in this matter.   At this hearing, Victor elicited testimony from numerous correctional witnesses and inmates.   This evidentiary hearing enabled the parties to fully inform the Court on the circumstances surrounding these spoliation claims, and provided us with a complete factual record upon which to rule on Victor's motion.

Having carefully examined these matters, in the exercise of our discretion, we conclude that Victor's motions should be denied, in part, and granted, in part, as follows:   First, we find with respect to Victor's claims of wholesale spoliation of physical evidence that the Plaintiff has not carried his burden of proving culpable, intentional spoliation.   Rather, the evidence presented at this hearing reveals that prison officials, with differing understandings of prison record retention practices, made a series of decisions regarding retention of articles which led to the retention

of a great deal of probative evidence, even if it did not result in the retention of all evidence sought by Victor.

Yet, while we find that Victor has not established his wholesale claims of spoliation, we conclude that Victor is entitled to some limited relief since the evidence also reveals that certain Defendants may have made statements that a fact-fact finder could conclude were both contradictory and could support a false exculpatory inference. Therefore, if Victor elicits adequate proof of these matters at trial, we will in the exercise of our discretion provide Victor limited relief in the form of jury instructions which specifically address these issues relating to the prior statements of these witnesses and Defendants.

## II. **Findings of Fact**

With respect to Victor's multi-faceted spoliation motion, we find that the following facts were proven at the evidentiary hearing conducted by the Court:  In June of 2008, the Plaintiff, William Victor, was an inmate housed in the Restricted Housing Unit (RHU) at the State Correctional Institution (SCI) Huntingdon.  On the evening of June 28, 2008, Victor became embroiled in a series of increasingly contentious exchanges with prison staff relating to a plan to move Victor from his cell at the RHU, exchanges which escalated to the point where Victor was alleged to have thrown a shoe at a correctional officer and declined to comply with staff instructions

to move voluntarily.  Accordingly, a decision was made that prison officials would conduct an extraction of Victor from his cell, by force, if necessary.

At the time that this decision was made at SCI Huntingdon, there were in place at the institution several systems and practices which would  have captured evidence relating to this cell extraction and prisoner movement.  First, within the housing unit itself there were fixed surveillance cameras which recorded activities in the common areas of the housing unit on an on-going basis.  This constant video surveillance was conducted using video tape equipment which recycled and re-used tapes.  Thus, the fixed video surveillance system on the housing units typically would automatically re-use and tape over prior surveillance videos unless specific measures were taken to preserve particular videos.

A similar, fixed video surveillance system existed in certain observation cells inside the prison where inmates were placed for medical or psychiatric observation. Like the general housing unit video surveillance system, this observation cell surveillance system relied upon surveillance equipment which routinely and automatically re-used, recycled and taped over prior surveillance records.

Finally, as part of cell extractions there was a practice at the institution to assign to the cell extraction team a correctional staff member who served as a videographer, recording all inmate cell extractions.  On June 28, 2008, prison

officials followed this practice and assigned Correctional Officer Goodman as the videographer on Victor's cell extraction. Goodman was inexperienced as a videographer, and this was the first, and ultimately the only, occasion on which he performed this duty.

Officer Goodman's video of this June 28, 2008, episode is, therefore, the most complete and contemporaneous recorded account of this cell extraction. That video reveals that at approximately, 7:55 p.m., on June 28, 2008, Lieutenant William Diffin, who was assigned to oversee Victor's cell extraction, assembled a team of seven staff to conduct this operation. The cell extraction team included 5 correctional officers– Officers Lehman, Eberling, Pyle, Grove and Plummer–a videographer, Officer Goodman, and a nurse, Hallie Ritchey.

Once the team was assembled, Lt. Diffin briefed them regarding the proposed cell extraction. As part of this briefing, Diffin reported that Victor might be fashioning a noose from sheets in his cell as part of a suicide attempt.[1] Diffin's claim that Victor was making a noose on June 28 remains one of the principal controversies in this lawsuit, and is one of the primary issues with respect to this motion.

---

[1]Notably, a number of members of the cell extraction team later asserted that they did not recall this admonition by Lt. Diffin, although the statements are clearly made by this Defendant on the videotape.

As the cell extraction team assembled outside of Victor's cell, Lt. Diffin announced that Victor was "hanging up", or placing a noose around his neck. The cell extraction team then rushed into the cell and subdued Victor, taking him to the floor of the cell as they restrained, stripped and searched this inmate. The cell extraction video recorded by Officer Goodman provides only a very limited view of this aspect of this operation. Goodman remained outside the cell and, therefore, had only a limited and obstructed view of what transpired inside the cell. The video, however, does not clearly depict any noose made from bedding. Indeed, any view of Victor or his cell is largely obscured by the correctional staff who are working in this confined space to restrain him. The audio portion of the cell extraction video reveals, however, that as Victor was being restrained he challenged the assertion that he had been "hanging up," and can be heard repeatedly denying that he had made a noose from a sheet.

Furthermore, the members of the cell extraction team who entered Victor's cell to restrain him on June 28, subsequently provided inconsistent accounts regarding the presence of a noose fashioned from bedding in the cell. Some officers have asserted that they observed either a noose or bedding draped around Victor's throat; other cell extraction team members do not recall observing any such home-made noose. Moreover, while one correctional officer, Defendant Snyder, reported recovering the

noose from Victor's cell and carrying it away from the scene, other inmate eyewitnesses insisted that the knotted sheet was brought to the cell by correctional officers. This confusion is then compounded by the fact that the knotted sheet was not preserved by corrections officials. Instead, prison officials photographed the knotted bedding which they stated they had recovered from Victor's cell, but did not retain the sheet in its original state. Thus, at present the only extant evidence of this noose is the prison photograph of the knotted sheet. Further heightening this confusion regarding the source and existence of this noose is the fact that one member fo the cell extraction team, Nurse Ritchey, has provided what may be construed as inconsistent statements regarding the presence of a noose, initially submitting a statement which indicated that Victor had placed a noose around his neck, and then later recanting that statement, alleging that her initial statement was false and asserting that she had not actually observed the noose which she initially reported, but was merely repeating what she was told by others.

Once Victor was subdued in his cell, he was removed from that cell by the cell extraction team, and was transported by the team to an adjoining cell block where he was placed in another cell. During this prisoner transfer process, the cell extraction video does not clearly depict Victor, who is obscured by the transporting officers. Nonetheless Victor can be heard clearly and distinctly speaking out and challenging

the correctional staff's conduct, actions on Victor's part are inconsistent which the injuries Victor ultimately suffered, a broken jaw which rendered him largely mute and speechless.

When Victor was placed in the second cell by the cell extraction team, Officer Goodman's cell extraction video reveals that the view of this prisoner was once again obscured in the narrow confines of the cell by correctional staff.  Yet, while Victor cannot clearly be seen in the video, the cell extraction video captures graphic proof of some serious injury suffered by Victor, as Victor can be plainly heard screaming in pain.  Victor then falls mute, but later can be observed on the video gesturing to Lt. Diffin and Nurse Ritchey through the cell door window, pointing to his broken jaw.

All of these events can be observed on the cell extraction video.  However, after this cell extraction was completed, Victor was placed in the second cell and released from his restraints, the cell extraction video was briefly stopped for approximately 8 seconds, before resuming.  This brief interruption in the cell extraction video, which came at the conclusion of the cell extraction procedure, is yet another controversy in this case and a potential spoliation issue raised by Victor in this spoliation motion.

On June 28, 2008, shortly after this cell extraction concluded, Victor was transferred to a psychiatric observation cell, where his actions were videotaped.

These videotapes further confirmed that Victor had suffered some serious injury to his jaw, as Victor can be seen in the observation cell repeatedly spitting blood from his mouth injury.  Correctional officials have produced these videotapes for Victor and have also provided detailed medical records of examinations conducted of Victor by nursing staff in the hours immediately following this cell extraction.  While they have produced this extensive documentation, correctional officials reported that some observation cell logs could not be located.  Despite the fact that the videotapes themselves were produced, Victor has cited the loss of some logs as another act of spoliation.

When the examinations conducted by prison medical personnel through the evening of June 28-29, 2008, confirmed that Victor had suffered a serious jaw injury he was transported to a local hospital, where medical staff confirmed that Victor had suffered a broken jaw during this encounter.  From the hospital Victor sent a written request by facsimile to prison officials asking them to preserve all stationary video footage depicting this cell extraction, as well as the cell extraction team video.  Prison investigative staff at SCI Huntingdon did not immediately act upon Victor's request.  Instead, they conducted an initial, limited inquiry into this incident in July 2008.  However, by late July 2008, as the extent and gravity of Victor's injuries became more apparent, more comprehensive investigations were undertaken by corrections

officials, including ultimately the Department of Corrections, Office of Professional Responsibility.  As part of those investigations, by late July 2008, steps were taken to preserve prison videotapes relating to this incident.

When these efforts were undertaken, prison officials were able to retrieve the entire cell extraction videotape filmed by Officer Goodman.  Prison officials also recovered extensive videotapes of Victor in the psychiatric observation cell following the cell extraction.  These videos confirmed that Victor had suffered a serious jaw injury and was bleeding from inside his mouth.  As for the stationary cameras mounted in the RHU corridor itself, however, only very limited portions of these videos were still in existence when correctional officials began their efforts to recover these tapes.  The balance of these particular videos had been re-used at the prison and were no longer in existence.

Aside from these issues relating alleged spoliation of physical evidence, the personnel and professional responsibility investigations conducted by corrections officials also entailed numerous interviews of corrections staff, including the Defendants named in this lawsuit.  Those interviews revealed inconsistencies between staff accounts, particularly as they related to the claimed presence of a home-made noose inside Victor's cell, and highlighted internal inconsistencies in statements made by Nurse Ritchey, who initially made a statement indicating that Victor had a noose,

but then partially recanted this statement, later saying that she had not actually observed what she had first detailed in this report. These investigative reports, and underlying documents, were retained by the Defendants and provided in discovery to the Plaintiff. Thus, ironically, much of Victor's spoliation claim rests on evidence carefully amassed and preserved by the Department of Corrections.

In his spoliation sanctions motion, Victor broadly characterizes all of this conduct as sanctionable spoliation, alleging that the loss of the knotted bedding, the failure to retain all videos, the brief 8 second interruption in the cell extraction video, and the alleged inconsistencies in witness statements all are proof of willful spoliation which justifies imposition of sanctions. The Defendants, in turn, argue that no spoliation has occurred here, and contend that Victor's motion should be denied in its entirety.

For the reasons set forth below, we adopt a middle course. In light of the substantial evidence that was preserved by the Department of Corrections relating to this incident and the reasonable explanations provided by non-defendant corrections officials for the inability to recover some additional evidence, we find that the specific instances in which items of possible relevance were not retained do not rise to the level of intentional spoliation of evidence. Therefore, we will deny Victor's request for spoliation sanctions. However, we conclude that the evidence does

disclose inconsistencies and contradictions between Defendants regarding whether Victor had fashioned a home-made noose at the time of the cell extraction. Given these inconsistencies and contradictions, we conclude that Victor is entitled to present evidence at trial to support his position that the claims made by some Defendants regarding this suicide attempt were false. We also conclude that, if Victor presents adequate evidence at trial relating this issue, then the Plaintiff will also be entitled to jury instructions relating to prior inconsistent statements by Defendants, as well as an instruction addressing an inference which may arise if a party makes what the jury finds to be a falsely exculpatory statement.

## II.   **Discussion**

In our view Victor's *pro se* spoliation sanctions motion conflates several different legal concepts: spoliation of physical evidence, impeachment of parties by prior inconsistent statements, admissions by party-opponents, and the legal relevance of allegedly false exculpatory statements as evidence of consciousness of wrongdoing. In this case, while we find no actionable spoliation of physical evidence, we conclude that the conflicting and contradictory statements previously made by some parties in this case regarding Victor's alleged suicide attempt warrant some instructions concerning issues of impeachment by prior inconsistent statements, admissions by party-opponents, and the evidentiary significance of allegedly falsely

exculpatory statements as evidence of consciousness of wrongdoing.  We discuss these issues in turn.

### A.   Spoliation–the Legal Standard

Turning first to Victor's various spoliation claims, the legal benchmarks which govern our assessment of such claims have been recently defined with precision by the United States Court of Appeals for the Third Circuit in Bull v. United Parcel Service, Inc., 665 F.3d 68 (3d Cir. 2012).  In Bull, the court of appeals observed that: "Sanctions for spoliation of evidence are reviewed for an abuse of discretion. In re Hechinger Inv. Co. of Delaware, Inc., 489 F.3d 568, 574 (3d Cir.2007)." Bull v. United Parcel Serv., Inc., 665 F.3d 68, 73 (3d Cir. 2012).  Yet, while evidentiary rulings regarding whether a spoliation inference is appropriate rest in the sound discretion of the court, Ward v. Lamanna, 334 F. App'x 487, 492 (3d Cir. 2009), that discretion is guided by settled legal tenets, tenets which define both the fundamental nature of spoliation and the appropriate sanctions for acts of spoliation.  At the outset, "[s]poliation is usually referenced in instances where evidence has been altered or destroyed. See Micron Technology, Inc. v. Rambus Inc., 645 F.3d 1311, 1320 (Fed.Cir.2011) (Spoliation occurs when evidence is destroyed or altered, or when a party fails to preserve evidence in instances where litigation is pending or reasonably foreseeable.). . . . [However] a party's failure to produce a document can have the

same practical effect as destroying it and . . . , under certain circumstances, nonproduction of evidence is rightfully characterized as spoliation." Bull v. United Parcel Serv., Inc., 665 F.3d at 73.  Accordingly, as a general rule the term spoliation embraces both "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd., 348 F.Supp.2d 332, 335 (D.N.J.2004)." Fortune v. Bitner. No. 01-111, 2006 WL 839346, *1 (M.D.Pa. March 29, 2006); see Ogin v. Ahmed, 563 F.Supp.2d. 539, 542 (M.D. Pa. 2008).

Because spoliation speaks to the sanctions for the destruction, alteration or concealment of physical evidence, spoliation claims typically arise with respect to tangible evidence which is lost or destroyed.  Issues relating to testimonial matters, such as party-admissions, or impeachment of witnesses by prior inconsistent statements, are embraced by other evidentiary rules.  Furthermore, spoliation generally occurs only when otherwise pristine evidence is destroyed, altered or hidden.  Allegations like those made here by Victor that parties have fashioned falsely exculpatory evidence are judged against separate legal principles, principles which recognize that:  "it is well settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt."

United States v. Kemp, 500 F.3d 257, 296 (3d Cir.2010). See Victor v. Lawler, 3:08-CV-01374, 2011 WL 3794951 (M.D. Pa. Aug. 26, 2011).

Spoliation claims are typically judged against a four-part test, a standard which finds that: " Spoliation occurs where: [1] the evidence was in the party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and, [4] the duty to preserve the evidence was reasonably foreseeable to the party." Bull v. United Parcel Serv., Inc., 665 F.3d at 73. See Ogin,563 F.Supp.2d at 543 ("[R]elevant authority requires that four (4) factors be satisfied for the rule permitting an adverse inference instruction to apply: 1) the evidence in question must be within the party's control; 2) it must appear that there has been actual suppression or withholding of the evidence; 3) the evidence destroyed or withheld was relevant to claims or defenses; and 4) it was reasonably foreseeable that the evidence would later be discoverable. Mosaid, 348 F.Supp.2d at 336  citing Brewer, 72 F.3d at 334; Scott v. IBM Corp., 196 F.R.D. 233, 248-50 (D.N.J.2000); Veloso v. Western Bedding Supply Co., 281 F.Supp.2d 743, 746 (D.N.J.2003).)"

In practice, spoliation litigation rarely turns on issues relating to the first two aspects of this four-part test.  In most instances, and in this case, it is self-evident that: " [1] the evidence was in the party's control; [and] [2] the evidence is relevant to the

claims or defenses in the case." Bull v. United Parcel Serv., Inc., 665 F.3d at 73.

Rather, the critical issues in assessing whether spoliation inferences are proper

typically revolve around the latter two aspects of this four-part test; namely, whether:

"[3] there has been actual suppression or withholding of evidence; and, [4] the duty

to preserve the evidence was reasonably foreseeable to the party." Id.

Turning first to the duty to preserve, the applicable benchmark in this regard

is whether that duty was "reasonably foreseeable to the party." Id.  "[T]he question

of reasonable foreseeability  is a 'flexible fact-specific standard that allows a district

court to exercise the discretion necessary to confront the myriad factual situations

inherent in the spoliation inquiry.' Micron Technology, Inc., 645 F.3d at 1320." Bull

v. United Parcel Serv., Inc., 665 F.3d at 77-78. Thus, "[a] party which reasonably

anticipates litigation has an affirmative duty to preserve relevant evidence. Baliotis

v. McNeil, 870 F.Supp. 1285, 1290 (M.D. Pa.1994).  Where evidence is destroyed,

sanctions may be appropriate, including the outright dismissal of claims, the

exclusion of countervailing evidence, or a jury instruction on the 'spoliation

inference.'  This inference permits the jury to assume that 'the destroyed evidence

would have been unfavorable to the position of the offending party.' Schmid v.

Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir.1994)." Howell v. Maytag, 168

F.R.D. 502, 505 (M.D.Pa. 1996).

However, a finding that a party had a duty to preserve evidence which was lost will not, by itself, warrant spoliation sanctions.   The party seeking spoliation sanctions must also prove a culpable state of mind.  In this respect:

> For the [spoliation] rule to apply ... it must appear that there has been an actual suppression or withholding of the evidence. *No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. See generally* 31A C.J.S. Evidence § 156(2); 29 Am.Jur.2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.").
>
> Brewer, 72 F.3d at 334 (emphasis added).  Therefore, a finding of bad faith is pivotal to a spoliation determination.  This only makes sense, since spoliation of documents that are merely withheld, but not destroyed, requires evidence that the documents are actually withheld, rather than—for instance—misplaced.  Withholding requires intent.

Bull v. United Parcel Serv., Inc., 665 F.3d at 79 (emphasis in original).

If the Court finds that there is a culpable destruction or spoliation of evidence, the question then becomes determining the appropriate sanction for this act of spoliation.  In this respect:

> The United States Court of Appeals for the Third Circuit has applied three (3) key considerations to determine whether a sanction for spoliation of evidence is appropriate. Schmid, 13 F.3d at 79. The considerations are: 1) the degree of fault of the party who altered or destroyed the evidence; 2) the degree of prejudice suffered by the

opposing party; and 3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. <u>Id</u>. When appropriate, a court may impose any potential sanction including:  1) dismissal of a claim or granting judgment in favor of a prejudiced party; 2) suppression of evidence; 3) an adverse inference, referred to as the spoliation inference; 4) fines; and 5) attorneys' fees and costs. <u>Mosaid</u>, 348 F.Supp.2d at 335.

<u>Ogin</u>, 563 F.Supp.2d at 545.

With regard to each of these elements of a spoliation claim:  "As a general rule, the burden of proof on a spoliation claim lies with the party asserting that spoliation of evidence has taken place.  <u>Byrnie v. Town of Cromwell, Bd. of Ed.</u>, 243 F.3d 93, 107-08 (3d Cir.2001)."  <u>Williams v. Klem</u>, 3:07-CV-1044, 2010 WL 3812350 (M.D. Pa. Sept. 22, 2010).

## B.      <u>Victor Has Not Proven the Elements of a Spoliation Claim</u>

With respect to the items of physical evidence identified by Victor as to which the Plaintiff has advanced a spoliation claim, we find that Victor has not carried his burden of proving culpable spoliation of evidence.  For the most part these spoliation claims relate to prison videotapes, including both the handheld cell extraction video filmed by Officer Goodman, as well as the stationary video recordings in the RHU unit and the observation cell.  As to all of these videotapes Victor has made claims of spoliation.

With respect to these items of physical evidence we find that the first two elements of a spoliation claim are satisfied:  " [1] the evidence was in the party's control; [and] [2] the evidence is relevant to the claims or defenses in the case." Bull v. United Parcel Serv., Inc., 665 F.3d at 73.  However, we conclude that Victor's spoliation claims relating to this videotape evidence fail on the final two elements of spoliation, whether: "[3] there has been actual suppression or withholding of evidence; and, [4] the duty to preserve the evidence was reasonably foreseeable to the party." Id.  In particular, we find that Victor has not made a showing "of bad faith [which] is pivotal to a spoliation determination." Id. at 79.

In reaching this conclusion we find that the evidence, taken as a whole, simply does not support a conclusion of ongoing, intentional spoliation.  Rather, what the evidence reveals is halting, uncertain efforts by various correctional staff, taken at different times in the days and weeks following this incident to preserve and retain video evidence.  Furthermore, these efforts are taken against the backdrop of institutional rules which did not set uniform and firm video retention standards.

In fact, we note that, as a result of these efforts, significant relevant video footage was preserved depicting both the cell extraction and Victor bleeding in the observation cell following this incident.  That footage, which was preserved by prison officials, provides graphic confirmation of the severity of Victor's injuries as Victor

can be seen frequently spitting out blood.  Moreover, the audio portions of the cell extraction video, which captures Victor's screams after he is placed in the second cell, strongly corroborates aspects of Victor's claims.  This substantial footage, which confirms significant elements of Victor's claims, was preserved by staff, conduct which we find to be wholly inconsistent with a claim of intentional spoliation.

In particular, we do not find any intentional spoliation in connection with the handheld video footage shot by Officer Goodman of the cell extraction itself.  While the quality of this video footage is uneven, we credit and find credible the testimony of those witnesses who identified Goodman as an inexperienced videographer, who was not employed in this capacity either before, or after, June 28, 2008.  Therefore, we conclude that any shortcomings in this video's depiction of events is a function of Goodman's lack of experience and is not a product of intentional spoliation.  Our conclusions in this regard are buttressed by the fact that the cell extraction video captures clear evidence that Victor has suffered a significant injury, as Victor can be heard screaming while officers are restraining him in the second cell into which he was placed.

Furthermore, while Victor has identified a brief interruption in this video, we find that this interruption does not present evidence of material, intentional spoliation of the videotape.  Instead, the cell extraction video was halted for approximately 8

-20-

seconds at 8:15 p.m., on June 28, 2008.  This brief interruption took place after the cell extraction was completed, and after Victor had been placed in the second cell at the RHU.  The interruption in the tape is momentary, is noted on the tape, and after this brief interruption, Goodman videotaped other pertinent scenes.  Specifically, Goodman recorded Victor attempting to gesture through the cell window and indicate to Lt. Diffin and Nurse Ritchey that he has suffered a serious jaw injury.  Thus, the 8 second interruption in the video occurred at a moment when no pertinent activity was taking place, followed the videotaping of the cell extraction itself which captured audio evidence of some serious injury to Victor, and, then was followed in turn by a recording of Victor attempting to convey and report his injuries to medical personnel and correctional supervisors, who do not appear to immediately react to Victor's complaints.  Taken as a whole, and viewed in this context, the 8 second interruption in this 25 minute videotape cannot be seen as an episode of intentional spoliation.

As for the stationary video camera footage in the corridors of the RHU unit, we recognize that Victor contacted correctional staff from the Altoona Hospital shortly after this incident, reporting his injuries and requesting that they preserve these videotapes.  Correctional supervisors did not immediately act upon Victor's request.  Instead, they first sought to preserve these particular fixed camera videos approximately one month after this incident, on July 31, 2008.  At that time prison

officials were able to recover only portions of the requested videotapes, because the surveillance equipment had automatically taped over much of the prior footage.  With respect to this particular RHU unit fixed camera video footage, we recognize that staff cannot be compelled to save footage at the mere insistence of inmates.  In this case, however, we believe that the extent of Victor's injuries, and the potential for further inquiry and possible litigation concerning this matter, coupled with Victor's specific request for retention of these videos, could have created some reasonable foreseeability that these particular videos should have been preserved prior to the end of July 2008, satisfying the third element of the spoliation standard defined by the court of appeals in Bull.  However, we cannot conclude that the failure by these officials to act earlier in preserving this video meets the final element of a spoliation claim, and rose to the level of intentional spoliation by corrections staff.

Quite the contrary, substantial evidence rebuts the inference of intentional spoliation, including the fact that the same officials who briefly delayed before attempting to recover these specific videos were actively working to retain and preserve other relevant videotapes and evidence, including observation cell videos depicting Victor on June 28, 2008.  Thus, the conduct of these officials is inconsistent with intentional spoliation.  Rather, our assessment of the evidence and testimony of the officials is that, while they may have reacted in a halting fashion in this specific

regard, they acted in good faith, preserving video evidence as they came to recognize its relevance to the issues emerging in the wake of Victor's injuries.  Indeed, as a result of their efforts, substantial video evidence was preserved which is relevant to Victor's case and might not otherwise exist but for the actions of these correctional officials.  Therefore, we cannot find that the failure to preserve all possible video evidence rose to the level of culpable, deliberate spoliation.[2]

Nor do we find that the inability of correctional officials to locate some observation cell logs amounts to intentional spoliation.  Once again, we note that prison staff thoroughly documented Victor's brief detention in this observation cell in the hours after this cell extraction in multiple ways, both through videotapes and medical and staff observation notes.  Given this degree of evidence which was preserved pertaining to Victor's observation cell detention, we conclude that Victor cannot show deliberate spoliation of evidence simply by citing some additional log reports which cannot be located.

_____

[2]Furthermore, we note that the materiality of this missing RHU unit corridor fixed surveillance videotape is undermined by the fact that the existing evidence strongly suggests that Victor suffered his serious jaw injury after he was transferred into the second cell in the RHU.  Therefore, the fixed surveillance of the RHU corridors, which would only depict actions occurring in the common areas of the housing unit, would not have captured proof of this particular injury which lies at the heart of Victor's case.  That evidence is instead captured on the cell extraction video which was preserved and is available to Victor.

### B.   Victor Will be Permitted to Present Proof in Support of His Claim That Some Defendants Engaged In Falsely Exculpatory Conduct

While we find that Victor has not carried his burden of proof regarding these specific claims of spoliation of certain physical evidence, we have determined that Victor should be permitted at trial to present evidence regarding another, separate assertion of staff misconduct, a claim that some staff created a falsely exculpatory account of this cell extraction, by falsely claiming that Victor was attempting to hang himself at the time of the cell extraction.

Victor's claim that staff falsely asserted that he was trying to hang himself has been one of the Plaintiff's's central contentions both in this litigation, and during this spoliation hearing.  While Victor has advanced this issue as a spoliation claim, we believe that it implicates other evidentiary rules.  Spoliation typically entails the destruction, alteration or concealment of otherwise pristine evidence.  Here, Victor is not claiming that valid evidence was destroyed.  Rather, he is saying something quite different–that a falsely exculpatory account of events was created by some Defendants on June 28, 2008, to justify the cell extraction and use of force against him.

At the outset, we recognize that there is a legal basis for Victor to advance such a claim. Indeed, "it is well settled that untrue exculpatory statements may be

considered as circumstantial evidence of the defendant's consciousness of guilt." United States v. Kemp, 500 F.3d 257, 296 (3d Cir.2010). See Victor v. Lawler, 3:08-CV-01374, 2011 WL 3794951 (M.D. Pa. Aug. 26, 2011).

Moreover, Victor has presented sufficient evidence supporting this contention to permit this issue to proceed to trial, relying in large measure upon the Department of Corrections Office of Professional Responsibility investigation findings which also concluded that there was evidence to support this claim. The evidence amassed by Victor based upon the Department of Corrections own internal investigation takes several forms:

First, several RHU inmate-witnesses have stated that they observed one Defendant, Correctional Officer Snyder, bring a sheet knotted as a noose to Victor's cell as the cell extraction took place, creating an inference that the noose was planted in the cell. While Defendants Diffin and Snyder have expressly and repeatedly denied this allegation, other evidence lends some support to this assertion, and defines this as an issue for trial in this case.

For example, the cell extraction video filmed by Officer Goodman does not clearly depict the presence of any home-made noose draped around Victor's neck at the time of the initial cell extraction, and a report of the interview with Goodman lends some further support to the statements of inmate witnesses, since Goodman at

one time claimed that he recalled inmates making contemporaneous claims that a noose was being planted in Victor's cell in that Goodman heard inmates shouting "Snyder sheet, set up" as he filmed the cell extraction. (Doc. 438 Ex. N)  This claim draws further support from the conflicting and contradictory accounts of the cell extraction team members on this issue.  In subsequent interviews, some members of the cell extraction team reported observing a sheet around or near Victor's throat when they entered the cell, (Doc. 438, Ex. K), while other cell extraction team members professed to have no such recollection.  (Doc. 438, Ex. R)  Finally, the medical member of this cell extraction team, Nurse Hallie Ritchey, is reported to have provided several different, and conflicting accounts, of this incident.  Initially Nurse Ritchey appeared to report that Victor had a noose around his neck and was attempting to "hang up" when the cell extraction team entered his cell.  (Doc. 438, Ex. M)  Later, Ritchey was reported to have recanted this statement, to some degree, describing her original statement as false, and asserting that she did not actually observe this activity by Victor but only reported what others told her had happened. (Id.)

Taken together, this evidence permits, but does not compel, a finding that the correctional staff accounts of Victor's efforts to hang himself on June 28, 2008, were not true.  That finding, in turn, is relevant to the factual issues in this lawsuit with

respect to the excessive force claims made by Victor.  In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley[v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).(quoting Whitley, 475 U.S. at 322). There are several factors that a court examines in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'"  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000). In this case, if Victor was presenting an immediate threat of harm to himself, that fact could justify the both the application of force, and the extent of the force used by correctional staff.  Conversely, if the claim of Victor's suicide attempt was shown to be false, that evidence would permit an inference that force was not applied solely in a good-faith effort to maintain or restore discipline.  Since the question of whether the correctional staff accounts of Victor's suicide attempt were false is

relevant to a determination of the Eighth Amendment issues in this lawsuit, and the conflicting factual background of this episode provides some grounds for Victor's contention that this staff account was false, we will permit Victor to present evidence on this issue and argue this claim at trial.

If Victor presents sufficient proof of this claim at trial for this issue to go forward for the jury's consideration, we will also favorably consider incorporating in our jury instructions three instructions that would guide the jury in its assessment of this evidence, and this issue.

At the outset, given the potentially conflicting statements made by some Defendants and witnesses, we will favorably consider giving an instruction to the jury, substantially in the form of this Circuit's Model Jury Instruction 4.22, instructing the jurors regarding their rights and responsibilities when assessing allegedly  prior inconsistent statements of witnesses.[3]

_____

[3]Model Instruction 4.22 provides as follows:  Impeachment of Witness – Prior Inconsistent Statement for Credibility Only.  You have heard the testimony of certain witnesses (if only one witness was impeached with a prior inconsistent statement, include name of witness).  You have also heard that before this trial (they)(he)(she) made (statements)(a statement) that may be different from (their)(his)(her) testimony in this trial.  It is up to you to determine whether (these statements were)(this statement was) made and whether (they were)(it was) different from the witness(es)' testimony in this trial.  (These earlier statements were)(This earlier statement was) brought to your attention only to help you decide whether to believe the witness(es)' testimony here at trial.  You cannot use it as proof of the truth of what the witness(es) said in the earlier statement(s).  You

Further, recognizing that a number of these competing and conflicting statements are made by Defendants, we will further favorably consider an instruction to the jury on its role in assessing prior statements allegedly made by individual Defendants in a multi-defendant trial, and will provide the jury with an instruction substantially in the form of this Circuit's Model Instruction 2.28.[4]

Finally, given the Plaintiff's claim, which lies at the heart of this lawsuit, that certain Defendants made a false exculpatory claim that he was attempting suicide to justify the use of force on June 28, 2008, we will also favorably consider providing the jury with an appropriate cautionary, limiting instruction on false exculpatory evidence, substantially in the form of this Circuit's Model Instruction, 4.31.[5]

---

can only use it as one way of evaluating the witness(es)' testimony in this trial.

[4]This instruction provides in part as follows:  Prior Statement of a Defendant – Multi-Defendant Trial. The plaintiff has introduced evidence that certain defendants made statements to others regarding the matters at issue in this lawsuit. I caution you that you may consider each defendant's statement only in resolving the case against that defendant.  You must not consider or discuss this evidence in any way with respect to any of the other defendants on trial. You must decide whether the defendant did in fact make the statement.  If you find that the defendant did make the statement, then you must decide what weight, if any, you feel the statement deserves.  In making this decision, you should consider all matters in evidence having to do with the statement, including those concerning the defendant and the circumstances under which the statement was made.

[5]That instruction, appropriately modified for use in this case, would read substantially as follows:  Consciousness of Guilt (False Exculpatory Statements). You have heard testimony that (name of defendant) made certain statements outside the courtroom in which (he)(she) claimed that (his)(her) conduct was

The submission of these instructions, however, will be contingent upon our assessment of the proof presented at trial. By taking these steps, we will acknowledge the claims made by the Plaintiff which derive sufficient support from the evidence to warrant their presentation to the jury. We will then provide the jury with appropriate, measured, fair, and balanced guidance regarding how they should weigh and assess these issues, guidance consistent with the animating principles identified by the court of appeals in its Model Jury Instructions.

An appropriate order follows.

---

justified because the plaintiff was attempting to hang himself. The plaintiff claims that these statements, and the defendants' claims that a noose was recovered form the plaintiff's cell, are false. If you find that (a defendant) made a false statement regarding this issue in order direct the attention away from (himself)(herself), you may, but are not required to conclude that (the defendant) believed that (he)(she) was responsible for some wrongful act. It is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish (his)(her) innocence. You may not, however, conclude on the basis of this alone, that (name of defendant) is, in fact, liable for the acts alleged against him/her by the plaintiff. You must decide whether or not the evidence as to (each defendant) shows that (he)(she) believed that (he)(she) was responsible for some wrongful act, and the significance, if any, to be attached to this evidence. In your evaluation, you may consider that there may be reasons – fully consistent with innocence – that could cause a person to give a false statement regarding some act. Fear, reluctance to become involved, or simple mistake may cause an innocent person to give such a statement or explanation.

### III.   Conclusion

For the forgoing reasons, Victor's motion for spoliation sanctions is GRANTED in part and DENIED in part as follows:  The Court denies Victor's request for spoliation sanctions, but will permit Victor to present evidence relating to his claim that prison officials produced falsely exculpatory evidence that he had attempted suicide, and will instruct the jury on this issue, as well as the related issues of impeachment by prior inconsistent statements, and consideration of alleged admissions by individual Defendants in a multi-defendant trial.

So ordered, this 10th day of May 2012.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge